MAXWELL, J.,
for the Court:
¶ 1. The Harrison County Chancery Court granted George William Rhodes Jr. (“Rocky”) and Stacey Anne Rhodes an irreconcilable-differences divorce. This case presents several questions regarding the chancellor’s classification and distribution of their assets. Stacey argues that the chancellor erred in rejecting her argument that several businesses and real-estate properties were marital assets or increased in value as a result of the parties’ active efforts. In particular, she challenges the chancellor’s finding that a Florida vacation home Rocky had purchased *434 three years before the marriage remained entirely his separate property. She contends the family-use doctrine converted the home to marital property. We agree.
¶2. Rocky and, to a much greater extent, Stacey and her daughter used the vacation home substantially during the marriage. The parties also assumed an active role in improving and maintaining the vacation home during the marriage. And mortgage payments were made from the parties’ earnings during the marriage. For these reasons, we find that the family-use doctrine applies and that the chancellor erred in determining that the vacation home was entirely Rocky’s separate property. Accordingly, we reverse and remand in part for the chancellor to reconsider the equitable division in a manner consistent with this opinion. The chancellor’s judgment is affirmed in all other respects.
FACTS AND PROCEDURAL HISTORY
¶ 3. Rocky and Stacey were married on October 19, 2003. According to Rocky, the relationship began to deteriorate as early as a year later. By January 2005, the parties had begun to discuss divorce. Around this same time, Stacey met with a divorce attorney. But it is undisputed that the parties did not formally separate until March 2007.
¶ 4. Rocky eventually filed for divorce in May 2007. As a result of Stacey’s request for temporary relief, the chancellor entered a temporary order on August 17, 2007, which among other things granted Stacey temporary use and possession of the vacation home in Santa Rosa Beach, Florida. The parties eventually withdrew their fault-based divorce grounds and submitted to the court several disputed issues regarding property classification and distribution, alimony, and attorney’s fees. The chancellor entered a final judgment of divorce and later an amended judgment in January 2009.
¶ 5. Rocky and Stacey had no children together. Stacey has a daughter from a previous marriage.

I. Businesses

¶ 6. One of the disputed properties is Rhodes Carpet & Draperies, Inc. (RCD), a Biloxi-based business started by Rocky’s parents in 1947. At the time of the divorce, Rocky served as president of the company and its sole shareholder. Rocky’s parents had conveyed then' interest in the company to Rocky and his brother, Keith Rhodes, soon after Rocky and Stacey’s marriage. These transfers resulted in each brother owning a one-half interest in the company. Keith then redeemed his stock for cash, making Rocky the sole shareholder. The chancellor found RCD to be Rocky’s separate property.
¶ 7. Rocky also owned and operated two other companies related to RCD — Rhodes Rental of Ocean Springs, Inc. and Rhodes Capital, LLC. The chancellor found both businesses were Rocky’s separate property.

II. Real-Estate Properties

¶ 8. The parties also contest the chancellor’s handling of (1) a vacation house in Santa Rosa Beach, Florida; (2) the Ocean Club Condominium; and (3) the marital residence.
¶ 9. Rocky purchased the Florida vacation house in 2000. The parties’ marriage ceremony took place on the beach next to the house, and they honeymooned there. As noted by the chancellor, both parties contributed to the upkeep and maintenance of the house, and Stacey redecorated the house. Throughout the marriage, the parties vacationed and spent holidays there. Stacey and her daughter lived in *435 the house from August 2005 until December 2005 in the aftermath of Hurricane Katrina. In addition, the chancellor’s temporary order granted Stacey temporary use and possession of the house. Nevertheless, the chancellor ultimately determined the residence was Rocky’s separate property. The chancellor found that “[a]ny significant amount of time spent there by [Stacey was] due to extraordinary circumstances or order of the Court.” The chancellor also found that all monetary contributions were made by Rocky, though some payments were made from a joint account.
¶ 10. The parties also dispute the proper classification of the Ocean Club condominium. Rocky testified that a one-third interest in the condo was purchased by RCD as a corporate asset, but it was mistakenly titled in his name. RCD’s balance sheets list the condo as an asset. The chancellor considered the condo an asset of RCD and therefore found it was Rocky’s separate property.
¶ 11. Stacey also disagrees with the chancellor’s award of the marital residence to Rocky. Stacey’s parents built the home in 1991, and the parties purchased the home from Stacey’s parents in 2004. Although noting Stacey’s sentimental attachment to the home, the chancellor refused to award the home to Stacey mainly due to her financial inability to pay the mortgage note.

III. Exclusion of Proposed Expert

¶ 12. Stacey’s trial counsel offered James Angle, a certified public accountant, as a business-valuation expert. Rocky’s counsel objected based on Angle’s methodology in forming his opinions. After hearing arguments from both sides, the chancellor excluded Angle from testifying in part because his valuation method included goodwill. The chancellor also noted Angle’s inexperience in performing business valuation, having only performed one valuation in a case study for one of his professional certifications.

TV. Alimony and Attorney’s Fees

¶ 13. The chancellor found that Stacey was left with a need following the equitable division and ordered Rocky to pay $2,000 per month for six months in rehabilitative alimony. The chancellor also ordered Rocky to pay one-half of Stace/s health insurance for six months and granted Stacey possession of the Florida vacation home for this same period of time.
¶ 14. The chancellor denied Stacey’s request for attorney’s fees based in part on her failure to establish an inability to pay.
STANDARD OF REVIEW
¶ 15. “Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record.” Henderson v. Henderson, 757 So.2d 285, 289 (¶ 19) (Miss.2000). We will not disturb a chancellor’s factual findings unless the chancellor’s decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard. Wallace v. Wallace, 12 So.3d 572, 575 (¶ 12) (Miss.Ct.App.2009). We do not substitute our “judgment for that of the chancellor, even if [we disagree] with the findings of fact and would arrive at a different conclusion.” Coggin v. Coggin, 837 So.2d 772, 774 (¶ 3) (Miss.Ct.App.2003). But when reviewing a chancellor’s interpretation and application of the law, our standard of review is de novo. Tucker v. Prisock, 791 So.2d 190, 192 (¶ 10) (Miss.2001).
*436 DISCUSSION
¶ 16. Stacey raises nine issues for our review. She alleges the chancellor erred by: (1) failing to find the Florida vacation home became marital property under the family-use doctrine; (2) finding Stacey was not entitled to any share of Rocky’s businesses; (3) finding the one-third interest in the Ocean Club condominium was Rocky’s separate property; (4) excluding Stacey’s property-valuation expert; (5) improperly applying Armstrong in awarding rehabilitative alimony; (6) denying Stacey’s request for attorney’s fees; (7) improperly applying Ferguson in ordering an equitable division of the property; (8) granting Rocky possession of the marital home; and (9) denying Stacey’s motion for a new trial.
¶ 17. For the reasons set forth below, we reverse and remand issue I, the Florida vacation home. On remand, the chancellor must revisit the issues pertaining to equitable division, issues I and VII. We affirm as to the remaining issues.

I. Vacation Home

¶ 18. In ordering an equitable distribution, chancellors are directed to (1) classify the parties’ assets as marital or separate, (2) determine the value of those assets, and (3) divide the marital estate equitably based upon the factors set forth in Ferguson. Larue v. Larue, 969 So.2d 99, 104 (¶ 11) (Miss.Ct.App.2007) (citing Ferguson v. Ferguson, 639 So.2d 921, 928-29 (Miss.1994)).[1] With respect to the vacation home, Stacey argues the chancellor improperly applied the first step in this analysis and wrongly found the vacation home was a separate asset owned entirely by Rocky.

A. Marital Property

¶ 19. The Mississippi Supreme Court has defined marital property as “any and all property acquired or accumulated during the marriage.” Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994). Excluded from this definition are assets “attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.” Id. at 914. For example, property that is “clearly obtained by one spouse through gift or inheritance is nonmarital property not subject to equitable distribution.” Larue, 969 So.2d at 106 (¶ 19) (citing Johnson v. Johnson, 650 So.2d 1281, 1286 n. 1 (Miss.1994)).
¶ 20. Though “marital property” is perhaps reducible to a relatively simple definition, there are several corollaries to the general rule. The chancellor must inquire whether any income or appreciation resulted from either spouse’s active efforts during the marriage. If so, that income or appreciation becomes part of the marital estate. Craft v. Craft, 825 So.2d 605, 609 (¶ 14) (Miss.2002); A & L, Inc. v. Grantham, 747 So.2d 832, 839 (¶¶ 23-24) (Miss.1999). Appreciation that is merely passive and not a result of either spouse’s active efforts remains separate property. Craft, 825 So.2d at 609 (¶ 14); Grantham, 747 So.2d at 839 (¶¶ 23-24). This standard has been referred to as the “active/passive test.” Deborah H. Bell, Bell on Mississippi Family Law § 6.03[4][a] (2005). We must presume that spousal efforts “whether economic, domestic or otherwise are of equal value.” Hemsley, 639 So.2d at 915; see also Hankins v. Hankins, 866 So.2d 508, 512 (¶ 20) (Miss.Ct.App.2004) (‘We presume that the efforts of each [spouse] make the contributions of the other possible.”).
*437 ¶ 21. In certain cases, the task of sorting out the marital estate does not end there. One spouse’s property may have lost its separate character by virtue of commingling or familial use. McKissack v. McKissack, 45 So.3d 716, 720 (¶ 18) (Miss.Ct.App.2010). Under these doctrines, the property may be converted from separate to marital property. Id. In attempting to clarify the proper terminology, we have explained that each doctrine’s application may be limited simply by the nature of the property itself.[2] For present purposes, it is sufficient to say that the family-use doctrine has proper application with respect to real property, but applying the commingling doctrine to real property generally goes against its common-sense application.
¶22. Further, our supreme court has held that jointly titling property does not give rise to a presumption regarding the marital or separate character of the property for the purposes of equitable division. Pearson v. Pearson, 761 So.2d 157, 168 (¶ 17) (Miss.2000). The converse is also true. Simply titling the property in one spouse’s name does not create a presumption that the property is separate. Morris v. Morris, 5 So.3d 476, 492 (¶ 38) (Miss.Ct.App.2008) (The fact that property was titled in husband’s name was “irrelevant” because “title is no longer determinative in deciding a party’s rights to the property.”); see also Carrow v. Carrow, 642 So.2d 901, 906 (Miss.1994) (Chancellors must “look behind the formal state of title” in making an equitable division.); Pittman v. Pittman, 791 So.2d 857, 862 (¶ 9) (Miss.Ct.App.2001) (quoting Pearson, 761 So.2d at 163 (¶ 16)) (“The possession or proportion of title does not create any greater property interest for the spouse in whose name it is held, or jointly held.”) (internal quotations omitted).
¶ 23. There is a rebuttable presumption that all property is marital. Yancey v. Yancey, 752 So.2d 1006, 1011 (¶ 20) (Miss.1999); Hemsley, 639 So.2d at 914. The burden of proof is on the spouse claiming property as a separate asset to rebut this presumption. Horn v. Horn, 909 So.2d 1151, 1165 (¶ 50) (Miss.Ct.App.2005) (citing Hemsley, 639 So.2d at 914). “This burden goes beyond a mere demonstration that the asset was acquired prior to marriage.” Grantham, 747 So.2d at 839 (¶ 23). Where there is a suggestion that the net equity in an asset may have increased due to a spouse’s active efforts, “there must be a showing [that] would allow the chancellor to separate the ... marital asset ... from the ... non-marital asset.” Id. (citing Oxley v. Oxley, 695 So.2d 364 (Fla.Dist.Ct.App.1997)); Stewart v. Stewart, 2 So.3d 770, 775 (¶ 15) (Miss.Ct.App.2009).
¶ 24. Stacey does not dispute the fact that Rocky purchased the vacation home prior to the marriage or that it was initially his separate property. Rather, she takes issue with the chancellor’s determination that $304,874 in equity in the vacation home all belongs to Rocky as his separate property. She frames her argument as two separate issues: (1) whether the home became marital property under the family-use doctrine and (2) whether the property appreciated in value as a result of her and Rocky’s active efforts. Because we find the family-use doctrine *438 applicable, we need not reach the issue of appreciation.

B. Family-Use Doctrine

¶ 25. Property that was once separate may convert to marital property under the family-use doctrine. This court first recognized the doctrine in Brame v. Brame, 98-CA-00502-COA (¶ 20) (Miss.Ct.App. March 28, 2000), rev’d in part on other grounds, 796 So.2d 970 (Miss.2001), where we held that a husband’s clock, piano, and dining set, all of which he received by gift, took on a “new personna of full family use, [and] became marital property for the purposes of classification.” See also Bell, at § 6.04[1].
¶ 26. Since Brame, our courts have applied the doctrine in numerous cases. On many occasions, the doctrine has been applied to the marital residence. See, e.g., Stewart v. Stewart, 864 So.2d 934, 938 (¶ 13) (Miss.2003) (family-use doctrine converted family home to marital property); Boutwell v. Boutwell, 829 So.2d 1216, 1221 (¶¶ 17-23) (Miss.2002) (same); Hankins, 866 So.2d at 511 (¶ 16) (same); Lockert v. Lockert, 815 So.2d 1267, 1269 (¶ 10) (Miss.Ct.App.2002) (same).[3] Indeed, it has been observed that the doctrine will almost always apply to the family home. Faerber v. Faerber, 13 So.3d 853, 861 (¶ 28) (Miss.Ct.App.2009) (citing Stewart, 864 So.2d at 938-39 (¶ 16)). See also Bell, at § 6.04[l][b]. The doctrine has also quite often been held to apply to various other types of physical assets as well. E.g., Pittman, 791 So.2d at 866-67 (¶¶ 30-33) (applying family-use doctrine to furniture, china, silver, and jewelry).[4] But the doctrine’s application, of course, by no means requires chancellors to award an equal share in the property to each spouse if other equitable considerations dictate to the contrary. Stewart, 864 So.2d at 938-39 (¶¶ 16-18).
¶ 27. We are guided by Stewari, where the supreme court affirmed a chancellor’s determination that a family home converted from separate to marital property under the family-use doctrine. Stewart, 864 So.2d at 937-38 (¶ 13). The husband purchased the home a couple of weeks prior to the maniage, and the parties lived there together as husband and wife for approximately one year. Id. at 936 (¶¶ 2, 4). During the short marriage, the husband spent as much as $50,000 or $60,000 of his separate funds on the improvements, though the wife and her family provided much of the labor. Id. at (¶ 3). Prior to the divorce, the home burned down, leaving the parties debating whether insurance proceeds and the lot where the house had stood were marital or separate property. Id. at 936-37 (¶¶ 6, 9). The supreme court affirmed the chancellor’s finding that both were marital property as a result of the couple’s family use of the home. See id. at 938-39 (¶ 16). The court also affirmed the chancellor’s unequal award of a twenty-percent interest in the lot and the insurance proceeds to the wife due to the husband’s substantially larger financial contribution and the weight given by the chancellor to the wife’s smaller financial contributions and her non-financial contributions. Id. at 939 (¶¶ 17-19).
¶ 28. In Pittman, this court considered whether a wife’s interest in the marital home, which she inherited from her grandmother, became part of the marital estate. *439 Pittman, 791 So.2d at 862-63 (¶ 11). Like Rocky in our case, the wife in Pittman contended that much of the equity in the home remained her separate property. This court disagreed, finding “[r]egardless of whether one spouse purchased the majority of the interest in the home with inherited money or, as here, actually inherited the interest itself, the home is marital property.” Id. at 863 (¶ 11).
¶ 29. We recognize we are not dealing with the primary marital residence, as in Stewart or Pittman; still we find these cases instructive. Here, three years before the marriage, Rocky purchased the vacation home in Florida. Title has since remained in his name. When the parties married, Rocky still owed money on the mortgage. Some of the mortgage payments and utilities were paid from the parties’ joint checking account. Other mortgage payments were made from Rocky’s checking account where he deposited paychecks earned during the marriage. Stacey financially contributed to the joint account during the marriage by depositing her paychecks into the account until she resigned from her job in mid-2005 and by placing her child-support payments into the account.[5] During the marriage, the parties discussed refinancing the home, and ultimately, they did refinance in late 2003.
¶ 30. Rocky and Stacey had been dating for about four years at the time Rocky purchased the vacation home in 2000. It is not disputed that Stacey participated in selecting the home. According to Stacey, she has used the home often ever since it was purchased. As Stacey put it, the residence was a “second home.” Since the home was purchased, it is apparent that Stacey and her daughter from a prior marriage have used the residence to a much greater extent than Rocky.
¶ 31. Stacey testified that she assumed an active role in maintaining and improving the house. She claimed that she had performed yard work along with her father and daughter. Stacey and her father had also pressure washed the house. She performed various maintenance and improvement projects with her neighbor. She was also responsible for contacting repair and maintenance businesses and ensuring their payment for various repairs to the home, including those to the air conditioner and the water heater. Further, she took part in securing rent-paying tenants to live in the house. She claimed she decorated the home and shopped for and “picked out everything.” She purchased various items for the house — some from the parties’ joint checking account and some out of her own pocket.
¶ 32. During the marriage, the parties regularly vacationed there and spent holidays there. Stacey and her daughter lived in the house from August 2005 until December 2005 in the wake of Hurricane Katrina, and her daughter enrolled in school in the area during that period of time. According to Stacey, from 2005 to 2007, she split her time between living in the Florida house and the Biloxi residence. For a while after she discontinued living there full time in December 2005, Stacey claimed to spend one to two weeks there every month. According to Stacey, she has lived there exclusively since the chancellor’s August 2007 temporary order. Stacey claimed she was emotionally attached to the home due to memories from vacations and holidays spent there with her family. She claimed she had developed relationships with the neighbors and had become involved in a church in the area and “established ... in the community.”
*440 ¶ 33. Under these circumstances, we find the family use of the vacation home was sufficiently significant to warrant its inclusion in the marital estate. We are not persuaded by Rocky’s arguments on this issue, which we address in turn.
¶ 34. First, Rocky asserts that he made all financial contributions to the vacation home and that Stacey contributed nothing financially or otherwise. This court has explained that “one spouse’s contribution of all the funds necessary for the purchase [of real property] does not guide the court in determining [its] marital or separate ... character.” Pittman, 791 So.2d at 862 (¶ 10) (emphasis added). Considered in isolation, one spouse’s financial contribution to the property reveals little about the familial use or other contributions. Financial contributions must be considered in the context of other equitable considerations, such as the non-financial contributions of the other spouse, which are presumed equal to those of the primary wage-earner. Hemsley, 639 So.2d at 915. Further, Rocky does not dispute that Stacey contributed to the joint account from which the vacation home’s mortgage was paid during the marriage. So, although her financial contribution was perhaps meager when compared to Rocky’s, she did financially contribute. In addition, her non-financial contributions to the property were significant, as already discussed.
¶ 35. Rocky’s second argument, on which he relies heavily, is that the parties’ marriage was short lived. Though there was testimony that the union was unhar-monious after the parties had been married a year, the marriage continued for almost another two and a half years before the parties separated. The parties were actually married for over five years before the chancellor entered a final judgment. Stacey latches on to this fact and paints the marriage as having lasted five years. But regardless of which view of the length of the marriage is correct, we find this consideration is mainly applicable to the overall equitable distribution but not to the proper classification of the vacation home as marital or separate property, except as it applies to the degree of family use.
¶ 36. Under our limited standard of review, we find the chancellor manifestly erred in determining that Stacey was not entitled to any interest in the vacation home. We base our conclusion on the evidence before the chancellor that: (1) Stacey engaged in extensive efforts in the upkeep and maintenance of the property; (2) she undertook efforts toward its improvement; (3) she alone decorated the home; (4) Rocky made payments on the home from his earnings during the marriage; (5) Stacey contributed financially through deposits into the parties’ joint account; (6) she also contributed indirect housekeeping efforts to the home; (7) she and her family vacationed there regularly and spent holidays there; (8) she lived in the home for a significant amount of time and considered it a second home; and (9) she and her daughter used the property as their primary residence for several months following Hurricane Katrina.
¶ 37. For these reasons, we find the vacation home lost its character as Rocky’s separate property due to the Rhodes family’s substantial use of the property during the marriage. We therefore reverse the chancellor’s classification of the home. How the equity in the home should be divided is not resolved by this classification, and that issue is remanded for the chancellor to consider. On remand, the chancellor should revisit his equitable division in light of the vacation home’s inclusion in the marital estate.

II. Businesses

A. Rhodes Carpet & Draperies (RCD)

¶ 38. Rocky is now the president of RCD and its sole shareholder. His family *441 has owned and operated RCD since 1947. Rocky and his brother, Keith, each owned a twenty-four percent interest prior to Rocky and Stacey’s marriage. Less than two weeks after the parties married, Rocky’s parents “gifted” additional interests of twenty-six percent to both Rocky and Keith, so that each brother then owned a one-half interest. Approximately a week later, Keith redeemed all of his stock for cash, making Rocky the sole shareholder.
¶ 39. The chancellor found RCD, which he valued at $1,686,519.50, was Rocky’s separate property. Stacey contends this classification was error, and RCD is a mixed asset, having both marital and non-marital character. She admits that an equitable percentage of twenty-four percent remains Rocky’s separate property but contends the other seventy-six percent is marital property. First, she claims the twenty-six percent portion that Rocky acquired from his parents was compensation for work performed rather than a gift, and this interest is marital property. Second, she alleges the remaining fifty percent of the company acquired from Keith’s stock redemption is marital property. Finally, she argues that RCD appreciated in value due to Rocky’s active efforts during the marriage, and this alleged appreciated value is marital property. Stacey does not contend that any interest in the business became marital property under the commingling or family-use doctrines.
¶40. Our supreme court has defined “marital property” as “any and all property acquired or accumulated during the marriage.” Hemsley, 639 So.2d at 915.[6] Not included in this definition are assets “attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.” Id. at 914. Property acquired in a spouse’s individual capacity through an inter-vivos gift or inheritance is separate property, even if such property is acquired during the marriage. See Ferguson, 639 So.2d at 928; Hemsley, 639 So.2d at 914.
¶ 41. Marital property also includes the appreciation of an asset resulting from either spouse’s active efforts during the marriage. Craft, 825 So.2d at 609 (¶ 14); Grantham, 747 So.2d at 839 (¶¶ 23-24). Passive appreciation remains separate property. Id. We presume that each spouse’s contributions to the marriage are of equal value, whether financial, domestic, or otherwise. Hemsley, 639 So.2d at 915.
¶ 42. There is a rebuttable presumption that all property is marital. Yancey, 752 So.2d at 1011 (¶ 20); Hemsley, 639 So.2d at 914. The burden of proof is on the spouse claiming property as separate to rebut this presumption. Horn, 909 So.2d at 1165 (¶ 50) (citing Hemsley, 639 So.2d at 914).

(1) Gift Versus Compensation

¶ 43. Stacey first contends that Rocky’s parents’ October 30, 2003, transfer of their interest in RCD to Rocky was not a gift but instead was compensation for his work for the company. The chancellor disagreed based primarily on testimony by Keith and the Rhodes family accountant, who both testified that the stock transfer was a gift. The chancellor found:
The evidence presented shows that [Rocky’s] parents donated half of their stock to each of their sons. Keith testified that the stock given to him and to [Rocky] was a gift with no conditions attached, and that his sister was not gifted any stock because she did not plan to be involved in the business. The Rhodes family accountant ... also testified that the gifted stock had nothing to *442 do with compensation. There is no evidence that this gift of stock was a type of compensation.
We find no manifest error in this determination. Keith’s testimony touched on every element of a valid inter-vivos gift and supported that all were met.[7] He specifically testified that the stock did not cost anything. The family accountant echoed that the stock transfers to the brothers was a gift, which she added “had nothing to do with their compensation.”
¶ 44. Stacey argues that this case is analogous to Hankins, where the court held the chancellor did not commit manifest error by including stock certificates acquired by a husband during the marriage as part of the marital estate. Hankins v. Hankins, 729 So.2d 1283, 1287 (¶ 17) (Miss.1999). The supreme court reasoned in Hankins that the evidence did not “clearly establish” one way or the other whether the certificates “were gifts or remuneration for service given to the lumber company.” Id. at 1287 (¶ 18). We distinguish Hankins because the chancellor in this case found Rocky’s parents gifted their stock to Rocky, and this determination is supported by substantial evidence. Both RCD’s accountant’s testimony and Keith’s testimony support that the stock transfer was gratuitous and constitutes a gift.
¶ 45. We will not assume that the stock was compensation simply because Rocky and Keith had both worked for the company. Because the evidence convincingly supports the chancellor’s finding that the stock transfer was a gift, we find no error in this decision.

(2) Keith’s Stock Redemption

¶ 46. On November 7, 2003, Rocky’s brother Keith, who then owned a fifty-percent interest in RCD, redeemed all his stock in the company for its cash value. As a result, Rocky became the sole shareholder. Though the actual value of the company did not increase as a result of this transaction, Stacey contends the corporation’s purchase of the stock increased Rocky’s stake in the company and was really due to Rocky’s active efforts. For this reason, she argues one-half of the value of RCD should be considered marital property.
¶ 47. The chancellor found that “Keith’s shares of stock, which comprise a 50% interest in the corporation were not bought by [Rocky].” Rather, “[t]he stock was redeemed for cash value[.]” So the chancellor concluded Rocky’s “acquisition of this asset was not due to his efforts.” He further noted Stacey’s lack of contribution to RCD during the marriage.
¶ 48. Our supreme court’s precedent makes clear that passive appreciation — not a result of either spouse’s efforts — remains separate property. Craft, 825 So.2d at 609 (¶ 14); Grantham, 747 So.2d at 839 (¶¶ 23-24). Under the circumstances involved in this case, we find that it was not clearly erroneous for the chancellor to conclude that Keith’s stock redemption did not constitute active appreciation in the value of the company resulting from Rocky’s efforts.

(3) Appreciation

¶ 49. Stacey maintains that the overall value of RCD increased during the *443 marriage as a result of Rocky’s active efforts, and the chancellor should have found this alleged appreciation to be marital property. She readily admits that she contributed nothing directly to the alleged increase in value, but she argues her indirect contributions to the marriage, including her housekeeping efforts and contributions to the Florida vacation home,[8] entitle her to a share of the appreciated value of Rocky’s company.
¶ 50. Stacey does not take issue with the chancellor’s reliance on a report by James Koerber, a certified valuation analyst and certified public accountant accredited in business valuation, which Koerber prepared in part for the purpose of facilitating a corporate stock redemption by Rocky’s brother Keith.[9] She does contend, however, that the chancellor ignored other evidence showing an increase in the company’s value since Koerber compiled his report. As evidence of this alleged appreciation, she relies on the financial statements of RCD from 2004 to 2007. These statements show a considerable increase in income during 2006 but also a considerable plummet in 2007, which generated earnings much closer to pre-Hurri-cane Katrina levels. Stacey attempted to provide expert testimony as to the alleged increase in RCD’s value. But as we will explain below,[10] the expert’s testimony was properly excluded because his valuation method included goodwill, and he used a standard other than the “fair-market value” to value the business.
¶ 51. Both parties admit that the flooring business saw a considerable increase in its income during 2006 immediately following Hurricane Katrina, no doubt attributable to the many flooded homes on the Mississippi Gulf Coast and the high demand for new flooring at that time. They disagree, however, that the fair market value of RCD actually increased over the course of the marriage.
¶ 52. The chancellor fully recognized that the appreciated value of a business gained as a result of either spouse’s efforts is marital property. But he found that the overall value of RCD had not appreciated during the fairly short marriage, and the equitable value of the company remained Rocky’s separate property. The chancellor specifically noted:
It is undisputed that RCD experienced a surge of income in 2006 due to the effects of Hurricane Katrina. However, testimony was given by RCD’s accountant, [Peggy] Closson, and by [Rocky] that the economic boost in business was fleeting and income quickly dropped back. Closson testified that though profits for 2007 drastically depreciated, they remained slightly higher than pre-storm levels, but that [2008’s] first quarter showed RCD operating at a significant loss, much more than she had seen in all her years as an accountant.
¶ 53. In considering RCD’s value, the chancellor found:
There was no evidence presented to show an increase in the value of RCD. More recent balance sheets and tax returns were exhibited, which only serve to show a steady downward fluctuation in income with a drastic increase in income for 2006. Testimony was given by Closson, [Rocky], and Keith supporting the hypothesis that the 2006 economic boom was a short lived result of the effects of Hurricane Katrina. Unusual income from one year should not be considered in valuing a business, since it *444 is not indicative of the business’s historical or prospective earnings. With no evidence of any appreciation in value, there is no portion of RCD attributable to the marital estate.
¶ 54. We agree with Rocky that the record supports these findings. Stacey’s primary argument on this issue is that the chancellor improperly considered the company’s earnings for the first quarter of 2008, which was after the August 2007 temporary order was entered. “[W]hen equitably dividing marital property upon divorce, the date of valuation is necessarily within the discretion of the chancellor.” Hensarling v. Hensarling, 824 So.2d 583, 591 (¶ 25) (Miss.2002). We agree that the cutoff date for the accumulation of marital property here was when the temporary order was entered. See Fleishhacker v. Fleishhacker, 39 So.3d 904, 912 (¶ 40) (Miss.Ct.App.2009); Pittman, 791 So.2d at 864 (¶ 18). But we disagree with Stacey’s argument that the chancellor committed manifest error on this issue.
¶ 55. A chancellor’s findings are accorded considerable deference. And Stacey concedes that she did not directly contribute to the alleged increase in value. However, the inquiry does not stop there. We must account for her indirect contributions, which we presume allowed Rocky to actively contribute to his business. But Stacey does not identify how any increase in corporate earnings demonstrates an active appreciation in the overall value of the company due to Rocky’s efforts, managerial or otherwise. Under our limited standard of review, we find no reversible error regarding this issue.

B. Rhodes Capital and Rhodes Rental

¶ 56. Stacey contends these assets, both of which are intertwined with RCD, are marital property or actively appreciated during the marriage. But these businesses were formed using Rocky’s separate assets from RCD. “Assets are not subject to distribution where it can be shown that such assets ‘are attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.’” See Arthur v. Arthur, 691 So.2d 997, 1002 (Miss.1997) (quoting Hemsley, 639 So.2d at 914). And as with RCD, the record does not reveal that any appreciation in the value of these businesses occurred as a result of Rocky’s active efforts. Accordingly, we find no manifest error in the chancellor’s finding that these businesses were Rocky’s separate property.

III. Ocean Club Condominium

¶ 57. The chancellor found that a one-third interest in a condominium was Rocky’s separate property. Rocky testified that the property was purchased during the parties’ marriage by RCD as a corporate asset, but it was mistakenly titled in his name. RCD’s balance sheets list the condo as an asset. The chancellor did not value the condo separately, but simply accounted for it in valuing RCD.
¶ 58. Stacey argues the condo is marital property because Rocky had the property titled in his name. But the chancellor found credible Rocky’s testimony that the property was a corporate asset mistakenly titled in his name. The chancellor also noted that the balance sheets prepared by RCD’s accountant in the ordinary course of business listed the condo as a corporate asset.
¶ 59. As previously noted, “[a]ssets are not subject to distribution where it can be shown that such assets ‘are attributable to one of the parties’ separate estates prior to the marriage or outside the marriage.’” See Arthur, 691 So.2d at 1002 (quoting Hemsley, 639 So.2d at 914). We find the chancellor did not err in determining that the titling of the property was not determi *445 native and that the condo was Rocky’s separate property.

IV. Exclusion of Stacey’s Proposed Expert

¶ 60. Stacey offered James Angle, CPA, as an expert in business valuation. Rocky had previously filed a motion to exclude Angle’s testimony. With it, he attached Angle’s deposition in which Angle admitted his valuation method did not distinguish tangible from intangible assets such as goodwill. After hearing arguments from both sides, the chancellor determined the testimony was unreliable in part because Angle’s methodology included considerations of goodwill.
¶ 61. We review the trial court’s admission or exclusion of expert testimony for abuse of discretion. Poole ex rel. Poole v. Avara, 908 So.2d 716, 721 (¶ 8) (Miss.2005) (citing Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (¶ 4) (Miss.2003)).
1162. The admissibility of expert testimony is governed by Mississippi Rule of Evidence 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶ 63. Mississippi has adopted the federal standard set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and modified in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), for analyzing the admissibility of expert testimony. McLemore, 863 So.2d at 35 (¶ 5). The Daubert standard is a two-pronged inquiry: (1) whether the expert opinion is relevant in that it must “assist the trier of fact” and (2) whether the proffered opinion is reliable. Id. at 38 (¶ 16).
¶ 64. Daubert provides a list of factors for assessing reliability, including:
whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique’s operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.
McLemore, 863 So.2d at 37 (¶ 13) (citing Daubert, 509 U.S. at 592-94, 113 S.Ct. 2786). The party offering an expert’s opinion has the burden to show the opinion is based on reliable methods and procedures, and not on unsupported speculation or subjective beliefs. Id. at 36 (¶ 11).
¶ 65. The chancellor found Angle’s testimony unreliable in part because Angle had not performed a business valuation “other than what was required as a case study for one of his certifications.” We have no qualms with Angle’s qualifications as an expert in business valuation. And we disagree with the chancellor’s reasoning that Angle’s lack of prior experience providing in-court testimony sufficed as a valid reason to exclude his testimony. “The test is whether a witness ‘possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman.’ ” Grass v. State, 739 So.2d 428, 431 (¶ 15) (Miss.Ct.App.1999) (quoting McNeal v. State, 617 So.2d 999, 1007-1008 (Miss.1993)). Angle clearly possessed particular *446 accounting knowledge not possessed by a layman. Insofar as the chancellor excluded Angle’s testimony on this ground, he committed error.
¶ 66. Yet we note the chancellor rested his decision in part on a correct ground — Angle’s inclusion of goodwill in his valuation. Regardless of the basis of the chancellor’s decision, we do not find reversible error where the right result was reached although for the wrong reason. Puckett v. Stuckey, 633 So.2d 978, 980 (Miss.1993). This rule applies to the trial court’s admission and exclusion of evidence. Carter v. State, 167 Miss. 331, 342, 145 So. 739, 741 (1933); Anthony v. State, 23 So.3d 611, 617 (¶ 24) (Miss.Ct.App.2009).
¶ 67. Our supreme court recently made clear that, in a divorce action, goodwill should not be utilized in performing a valuation of a business. In Yelverton, the supreme court found error in the chancellor’s valuation of a husband’s interest in a car dealership because the valuation included goodwill. Yelverton v. Yelverton, 961 So.2d 19, 29 (¶¶ 20-22) (Miss.2007). The supreme court instructed the chancellor for the purposes of remand that “ ‘goodwill,’ whether ‘personal goodwill’ or ‘business enterprise goodwill’ shall not be included in the valuation of [the car dealership].” Id. at (¶ 21). See also Deborah H. Bell, Bell on Mississippi Family Law § 8.04[4] (Supp.2008) (recognizing Yelver-ton as finally resolving in the context of a service business “that goodwill — whether personal or business enterprise — shall not be included in a business valuation in divorce proceedings.”).
¶ 68. The Yelverton court quoted favorably its prior holding in Singley that “[goodwill is simply not property; thus it cannot be deemed a divisible marital asset in a divorce action.” Id. (quoting Singley v. Singley, 846 So.2d 1004, 1011 (¶ 18) (Miss.2002)); see also Watson v. Watson, 882 So.2d 95, 105-106 (¶¶ 45-46, 50) (Miss.2004). The supreme court has explained that goodwill should be excluded from business valuations because it leads to inaccuracy and unreliability in appraisals purporting to determine the fair market value of a business:
The term goodwill as used in determining valuation of a business for equitable distribution in a domestic matter is a rather nebulous term clearly illustrating the difficulty confronting experts in arriving at a fair, proper valuation. Goodwill within a business depends on the continued presence of the particular professional individual as a personal asset and any value that may attach to that business as a result of that person’s presence. Thus, it is a value that exceeds the value of the physical building housing the business and the fixtures within the business. It becomes increasingly difficult for experts to place a value on goodwill because it is such a nebulous term subject to change on a moment’s notice due to many various factors which may suddenly occur, i.e., a lawsuit filed against the individual or the death and/or serious illness of the individual concerned preventing that person from continuing to participate in the business. It is also difficult to attribute the goodwill of the individual personally to the business.
Singley, 846 So.2d at 1011 (¶ 18). The court later explained that “business enterprise goodwill” is just as objectionable as “personal goodwill,” because the two concepts “are simply too interwoven” to be divisible. Watson, 882 So.2d at 105 (¶ 46).
¶ 69. We find no language in Watson limiting Singley’s holding, as Judge Grif-fis’s dissent suggests, to single-owner professional practices. The Watson court simply held that personal and business- *447 enterprise goodwill should be excluded in valuing a solo professional practice. Watson, 882 So.2d at 106 (¶ 50). Yelverton clarified that the exclusion of goodwill is not limited to solo professional practices and applied Watson’s holding to a car dealership in which a husband owned a forty-eight percent interest. Yelverton, 961 So.2d at 29 (¶¶ 20-22). We fail to see how Rocky’s flooring business, wholly owned by him, should be treated differently than the car-dealership interest involved in Yelver-ton. Contrary to Judge Griffis’s view, Yel-verton’s discussion of Watson and Singley was not dicta. Yelverton’s application of the goodwill exclusion to businesses other than solo professional practices created precedent that the chancellor properly followed in excluding Angle’s testimony.
¶ 70. Stacey does not contest that her proposed expert attempted to value ROD using a valuation method including goodwill. Though Angle may have performed calculations under other methods that did not include goodwill, he declined to utilize these methods as the proper basis for forming his opinions. In reviewing Angle’s proffered testimony and his report, which was marked for identification only, it is clear that Angle relied on a valuation method that neither excluded goodwill nor separately assigned a value to it. The chancellor considered the applicable precedent and excluded Angle’s testimony in part because Angle considered goodwill. We find no abuse of discretion in this decision.

V. Rehabilitative Alimony

¶ 71. Stacey contends the chancellor improperly applied the Armstrong factors in this case in awarding rehabilitative alimony.[11] The chancellor awarded Stacey $2,000 per month in rehabilitative alimony for six months. He also ordered Rocky to pay one-half of Stacey’s health insurance for six months and permitted Stacey to remain in the Florida vacation house for this same period.
¶ 72. Due to our reversal of the chancellor’s equitable distribution,[12] we begin by noting that our supreme court has explained that an award of rehabilitative alimony is exempted from the general proposition that reversal of one financial award requires reversal of all. Lauro v. Lauro, 847 So.2d 843, 849 (¶ 15) (Miss.2003). In Lauro, the court explained: “Rehabilitative alimony is awarded to parties who have put their career on hold while taking care of the marital home. Rehabilitative alimony allows the party to get back into the working world in order to become self-sufficient. Therefore, rehabilitative alimony is not considered during equitable distribution.” Id. The Lauro court favorably cited its prior decision in Hensarling, where the court had reversed a chancellor’s valuation of the marital estate but affirmed the rehabilitative-alimony award. Id. (citing Hensarling, 824 So.2d at 591-92).
¶ 73. Stacey makes two arguments regarding the Armstrong factors.[13] *448 She argues the chancellor failed to sufficiently account for the disparity in the parties’ respective incomes. Stacey also alleges the chancellor failed to take into account her testimony regarding her health problems.
¶ 74. As to the first argument, we find the chancellor did not overlook the disparity in the parties’ assets. This is but one factor to be considered in the overall calculus of the award, and we find the chancellor accorded it proper weight. Secondly, we find the chancellor fully analyzed Stacey’s health concerns. The chancellor’s judgment explains:
[Stacey] is in reasonably good health but has some medical concerns. She testified that she has endometriosis, [Epstein-Barr], fibromyalgia and chronic fatigue. However, she does not see a doctor regularly. She was diagnosed with [Epstein-Barr] and chronic fatigue in 2002, but did not stop working until 2005. She testified that her health is better now [than] it was it 2002. With regard to health concerns affecting her ability to obtain employment, the Court finds her testimony less than credible due to the floundering answers given when asked why she ceased working. Furthermore, the Court believes that the evidence shows that [Stacey] is capable of employment and has chosen not to make any attempts to find work. Her work history shows experience in sales, property management, and secretarial/office administration duties. Given her skills and past employment, [Stacey] has an earning capacity of at least $20,000 per year.
This $20,000 figure is approximately what Stacey earned yearly as a high-school guidance counselor for approximately four years before discontinuing employment in 2005. She claimed she left the job because of her health, “finishing] the house,” preparing her daughter for college, and the stress of maintaining her finances. Contrary to Stacey’s assertions on appeal, she did testify that her health “[a]t the present [is] better than it has been since 2002.” It is undisputed that Stacey has not attempted to find work and that she has offered no medical evidence of any kind showing that her medical conditions hinder her ability to work. Indeed, her claims on this issue are inconsistent with her assertions that she performed many at least mildly strenuous physical activities in maintaining the parties’ properties.
¶ 75. The chancellor also considered the relatively short marriage and the above average standard of living enjoyed during the marriage. He also noted Stacey’s minor child from a previous marriage and her receipt of $350 per month in child-support payments. And he considered Stacey’s receipt of $2,000 monthly in temporary support from Rocky since the temporary order was entered. The chancellor found both parties were “far from retirement,” as Stacey was forty-five years old and Rocky was fifty-seven years old at the time of the trial. The chancellor further noted that he awarded Stacey a relatively new vehicle valued at over $22,000 without a monthly note and that Stacey has mini *449 mal monthly debts. Her other financial awards included over $10,000 in cash and more than $23,000 in Rocky’s 401K account. In the chancellor’s estimation, Stacey “should be able to seek and obtain gainful employment.” He reasoned that her unemployed since 2005 was a short enough period of time not to hinder her ability to find new employment. In keeping with the purposes of rehabilitative alimony, the chancellor found that some rehabilitative alimony was proper to assist her in the interim.
¶ 76. “When the appellate issue is an alleged inadequacy or denial of alimony, we will reverse only where the decision is seen as so oppressive, unjust or grossly inadequate as to be an abuse of discretion.” Pittman, 791 So.2d at 869 (¶ 47). Here, we find the chancellor did not abuse his discretion in setting the appropriate rehabilitative-alimony award.

VI. Attorney’s Fees

¶ 77. The matter of awarding attorney’s fees is largely entrusted to the sound discretion of the chancellor. McKee v. McKee, 418 So.2d 764, 767 (Miss.1982). “We are reluctant to disturb a chancellor’s discretionary determination whether or not to award attorneyfs] fees and of the amount of any award.” Smith v. Smith, 614 So.2d 394, 398 (Miss.1993).
¶ 78. Stacey claims error in the chancellor’s refusal of attorney’s fees. The chancellor denied attorney’s fees based partly on the fact that Stacey unilaterally acquired a $60,000 home equity loan using the marital home. The chancellor observed that the only evidence of the amount of her attorney’s fees was Stacey’s own testimony that she had paid $45,000 in attorney’s fees, $5,600 for deposition and subpoena costs, and $16,000 for expert fees. While noting that this exceeded the $60,000 loan, the chancellor found important that Stacey admitted that the fees had already been paid. Thus, the chancellor found that Stacey had not established an inability to pay.
¶ 79. Attorney’s fees may only be awarded to a party who has shown an inability to pay. Voda v. Voda, 731 So.2d 1152, 1157 (¶ 29) (Miss.1999); Pacheco v. Pacheco, 770 So.2d 1007, 1012 (¶26) (Miss.Ct.App.2000). Though Stacey contends Rocky is more capable of paying her attorney’s fees, she wholly fails to show that she is unable to pay them, which is a prerequisite to an award of attorney’s fees.
¶ 80. Further, Stacey has offered insufficient evidence to support an accurate assessment of her attorney’s fees. See McKee, 418 So.2d at 767 (reversing and remanding award based on insufficient evidence); Powell v. Powell, 644 So.2d 269, 276 (Miss.1994) (same). It is undisputed that Stacey offered no itemized bill of attorney’s fees. While an itemized bill is not always required and estimates may support an award in some circumstances, the estimate must offer a “clear explanation of the method used in approximating the hours consumed on a case.” McKee, 418 So.2d at 767; see also Watkins v. Watkins, 748 So.2d 808, 813 (¶¶ 13-14) (Miss.Ct.App.1999). The supreme court has reversed an award of attorney’s fees based solely on a wife’s testimony that she owed her attorney $500. Powell, 644 So.2d at 276; see also Turner v. Turner, 744 So.2d 332, 338-39 (¶¶ 29-33) (Miss.Ct.App.1999) (reversing attorney’s-fees award that was based solely on the testimony of a litigant that he owed $1,500 in attorney’s fees, which he was unable to pay). Here, too, we find Stacey did not produce sufficient evidence to support an award of attorney’s fees.
¶ 81. For these reasons, we find the chancellor acted within his discretion in refusing to award attorney’s fees to Sta *450 cey. Because attorney’s fees were properly denied for inadequacies of proof, we need not remand this matter along with the other financial awards.[14]

VII. Equitable Distribution and Marital Home

¶ 82. Since we find reversible error as to the classification of a marital asset, we must remand the entire equitable distribution for the chancellor to reconsider. In chancery practice, most of the financial awards accompanying the chancellor’s divorce decree are linked. See, e.g., Bell, at § 19.09[7]. Our supreme court has explained: “All property division, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together. Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede.” Lauro, 847 So.2d at 848-49 (¶ 13) (quoting Ferguson, 639 So.2d at 929) (internal quotations omitted).[15] In Thompson v. Thompson, 894 So.2d 603, 607 (¶ 22) (Miss.Ct.App.2004), we reversed the chancellor’s division of property, which we held also required reversal of the chancellor’s award of lump-sum alimony as well as her child-support determination. Also, in Duncan v. Duncan, 815 So.2d 480, 485 (¶ 16) (Miss.Ct.App.2002), we reversed a chancellor’s award of periodic alimony and, finding that any changes in that award would impact other aspects of the chancellor’s decision on remand, vacated all aspects of the final judgment relating to financial matters. Further, the supreme court has held reversal of a chancellor’s distribution of property also required reversal of any award of attorney’s fees. Lauro, 847 So.2d at 850 (¶ 18).
¶ 83. Though the chancellor’s overall Ferguson analysis in addition to his handling of the marital home appear reasonable, we remand these issues for the chancellor to reconsider, if necessary, in light of our decision today.
¶ 84. Further, on page thirty-two, in paragraph eighty-five of the chancellor’s amended judgment, he valued Stacey’s separate estate at $1,500,000, apparently based on a casino-lease interest. But at another point in the judgment, the chancellor stated “[a]ny value assigned to the leasehold interest at this time would be purely speculative.” On remand, we instruct the chancellor to clarify his findings regarding Stacey’s casino-lease interest.
CONCLUSION
¶ 85. For the reasons set forth above, we reverse the chancellor’s judgment in part because the chancellor found the parties’ vacation home was entirely Rocky’s separate property, despite evidence establishing various contributions by both parties to the equity accumulated in the property during the marriage. An equitable division of the home, of course, by no means requires an equal division, and the chancellor should accord sufficient weight to both Rocky’s and Stacey’s financial and non-financial contributions to the property. We remand the other equitable-distribution issues for the chancellor to reconsider, if necessary. On all other issues, we affirm the chancellor’s judgment.
¶ 86. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN *451 PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.
MYERS, P.J., IRVING and ROBERTS, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. KING, C.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LEE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY ISHEE, J. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY CARLTON, J.

. The chancellor should also consider the appropriateness of alimony if either party is left with a deficiency. Larue, 969 So.2d at 104 (¶ 11)

. For example, reasoning that it is untenable to apply the family-use doctrine to cash and cash equivalents, this court held that the proper analysis for that particular type of property is the commingling doctrine. McKissack, 45 So.3d at 720-21 (¶¶ 19-25). But in a real property context, it has been observed that "[p]ractically speaking, rarely does commingling or mixing apply to real property.” Hankins, 866 So.2d at 513 (¶ 27) (Southwick, P.J., concurring).

. But see Wilson v. Wilson, 820 So.2d 761, 763 (¶¶ 5-6) (Miss.Ct.App.2002) (marital home remained separate property in short marriage where husband paid for home entirely from proceeds of separate property).

. But see Gutierrez v. Bucci, 827 So.2d 27, 37-38 (¶ 57) (Miss.Ct.App.2002) (motorcycles bought with husband’s separate funds did not convert to marital property by wife occasionally riding them).

. Stacey has a daughter from a prior marriage.

. For additional discussion of marital property, see Issue I.A.

. The elements for a valid inter-vivos gift are:
(1) there must be a donor competent to make the gift; (2) the gift must be a free and voluntary act on his part done with the intention to make a gift; (3) the gift must be complete with nothing left to be done; (4) the property must be delivered by the donor, and accepted by the donee; (5) the gift must be gratuitous; (6) the gift must be irrevocable.
Hankins, 729 So.2d at 1287 (¶ 17).

. See Issue I.

. See Issue II.A(2).

.See Issue IV.

. Stacey does not contend that she is entitled to an award of periodic or lump-sum alimony. Since Stacey devotes all discussion to the chancellor's failure to accord weight to certain Armstrong factors, we will confine our analysis to these issues as well.

. See Issue VII.

. The Armstrong factors are:
(1) The income and expenses of the parties; (2) the health and earning capacities of the parties; (3) the needs of each party; (4) the obligations and assets of each party; (5) the length of the marriage; (6) the presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care; (7) the age of the parties; (8) the standard of living of the parties, both *448 during the marriage and at the time of the support determination; (9) the tax consequences of the spousal support order; (10) fault or misconduct; (11) wasteful dissipation of assets by either party; or (12) any other factor deemed by the court to be "just and equitable” in connection with the setting of spousal support.
Pittman, 791 So.2d at 869 (¶ 48) (quoting Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993)); see also Turnley v. Turnley, 726 So.2d 1258, 1266 n. 3, 1266-67 (¶¶ 27-28) (Miss.Ct.App.1998) (applying Armstrong factors to rehabilitative-alimony award).

. See Issue VII.

. But see Lauro, 847 So.2d at 849 (¶ 15) (explaining that "rehabilitative alimony is not considered during equitable distribution”). See also Issue V.