THOMPSON, Presiding Judge.
W.R. (“the father”) appeals from a judgment of the Mobile Circuit Court divorcing him from C.R. (“the mother”). For the reasons stated herein, we affirm.
The parties married in 1998. One child was born of the marriage. In June 2008, the parties adopted four children, three girls and a boy, who were siblings and all of whom were minors at the time of the trial. Pursuant to the Alabama Subsidized Adoption Act, § 26-10-20 et seq., Ala.Code 1975, as part of the adoption of those children, the parties began receiving a monthly adoption subsidy payment of $2,437.50 from the State.[1]
After they were married, the parties lived in a house that the father owned by virtue of a judgment divorcing him from his previous wife. In 2000, the parties sold that house and purchased another house (“the Mobile property”). The parties made a significant down payment on the Mobile property from the proceeds of the sale of their previous house, and they obtained a mortgage loan to finance the remainder of the purchase price of that property. Subsequently, the mother was in an automobile accident, and the parties applied $25,000 of the settlement proceeds the mother received because of that accident to a reduction of the principal of the mortgage loan on the Mobile property. The parties made extra payments on the mortgage loan so that, by 2007, the mortgage loan was paid off.
In October 2007, the parties purchased and moved into another house (“the marital residence”), financing that purchase with an equity line of credit secured by the Mobile property. The parties planned to pay off the line of credit with the proceeds from the sale of the Mobile property. At the time of trial, the line of credit had a balance of approximately $160,000.
In December 2008, the parties separated. The mother and the children remained in the marital residence, and the father moved back to the Mobile property. On January 29, 2009, the mother filed an action for legal separation from the father. On the same date the mother filed the action, the trial court entered an order awarding pendente lite custody of the chil *161 dren to the mother with weekly visitation for the father if he attended weekly therapy sessions.
On February 4, 2009, the mother filed a motion to restrict the father’s visitation with the children. She stated that the children’s therapist had filed a report with the Department of Human Resources alleging that the father had abused the children, that the father had learned about that report and had questioned the children extensively, and that the children were frightened to be around the father.[2] The mother subsequently amended her complaint to seek a divorce rather than a legal separation.
On February 20,2009, the mother filed a petition for protection from abuse on behalf of herself and the children in which she alleged that the father had injured her and had acted abusively toward some of the children. The father filed a motion to dismiss the petition or to transfer the action to the circuit judge who was presiding over the mother’s divorce action on the basis that the mother’s divorce action concerned the subject matter of her petition for protection from abuse. The court granted the father’s motion and transferred the mother’s petition to the domestic-relations division of the Mobile Circuit Court, where the mother’s divorce action was pending.
On March 12, 2009, the father filed a motion for contempt against the mother in which he asserted that the mother had not allowed him to exercise visitation with the children in violation of the court’s previous order permitting him to exercise weekly visitation with the children. In a separate motion requesting custody of the children, the father asserted that the mother was “mentally, emotionally, and physically cruel to the children.” He supported this latter motion with his own recitation of examples of the mother’s parenting, as well as with an affidavit of the mother’s parents in which they stated, among other things, that the mother had been verbally and physically abusive toward the children. The father also filed an answer to the mother’s complaint and a counterclaim for a divorce in which he sought, among other things, custody of the children.
On April 9, 2009, after a hearing, the trial court entered an order providing that the father would be allowed to exercise supervised visitation with the children. The father subsequently filed a motion for contempt against the mother in which he asserted that the mother had denied him visitation with the children in violation of the trial court’s April 9, 2009, order. On September 4, 2009, after a hearing on the parties’ pending motions, the trial court entered an order awarding the father visitation with the children on alternating weekends.
The trial court held a trial of the action on December 15, 2009. The mother testified that the parties had separated because the father, after the mother had warned him not to abuse the children again, had “given” one of their sons a black eye. She stated that the parties separated on the day of that incident. The mother testified that the father had been physically abusive *162 toward her. The father admitted that he had slapped the mother on one occasion, but he also testified that she had been physically abusive toward him.
The mother opined that the marital residence was worth $140,000. She stated that it was not in good repair, indicating that one wall had had sheetrock torn out of it, that water would leak into the downstairs area causing mold, that beams were missing from the ceiling of the living room, and that many of the appliances in the house did not work or did not work properly. She estimated that the cost to repair the marital residence exceeded $20,000. The father testified that the marital residence was in “average” condition when the parties purchased it and that it required only a “couple thousand dollars” in repairs. He opined that the marital residence was worth $160,000. The father submitted an exhibit indicating that his parents had loaned $17,000 to the parties to remodel the marital residence. The mother, however, testified that she was not aware of any such loan from the father’s parents.
The mother testified that the Mobile property was worth $200,000. The parties had offered that property for sale at slightly more than that amount. The father opined that the Mobile property was worth $160,000.
During part of the marriage, the mother had worked as a special-education teacher, earning approximately $28,000 annually. She had her teaching certificate at the time of trial, but she was no longer teaching. Instead, she was pursuing her master’s degree in social work as a full-time student. She also worked part time for a family center earning $14.50 per hour and averaging 20 hours of work per week.
The father worked at an automotive-parts company selling automobile parts. The ownership of that company was disputed at trial. The father and the children’s paternal grandfather testified that the paternal grandfather owned the company, and they denied that the father had an ownership interest in it. The mother, however, testified that the father had told her that he owned the business with his father, and a mortgage executed by the father and his parents in 2005 related to the company indicated that all three owned stock in the company. The father, along with his parents, owned the property on which the company was located, although the father testified that he did not realize that he had an ownership interest in that property until a few months before trial.
The father stated that he was paid $500 per week from his job at the automotive-parts company. The mother stated that the father was paid an additional amount in cash each week, but the father and the paternal grandfather denied that the father received any payments from the company beyond his weekly payroll check. In addition to a weekly salary, the company provided the father with a truck and medical insurance. The mother testified that, at some point during the marriage, the father had supplemented his income by obtaining automobiles that had been auctioned, repairing them, and reselling them for a profit. The father testified that he had not done this in the previous six or seven years.
The mother testified that the monthly adoption subsidy of $2,437.50 that she received was for the adopted children’s special needs. The amount of the subsidy for each of the three adopted daughters was approximately $450, while the amount of the subsidy for the adopted son was $1,070. The mother stated that the adopted son has Asperger’s syndrome, reactive attachment disorder, attention deficit/hyperactivity disorder, Tourette’s syndrome, and post-traumatic stress disorder. She stated that two of the adopted *163 daughters have reactive attachment disorder and that one also has attention deficit disorder. The mother testified that she used the monthly adoption subsidy payment to pay for specialized babysitting, which cost $800 per month; for therapy for one of the daughters, which cost $600 per month; for private-school tuition for one of the daughters, which cost $291 per month; and for therapy for the adopted son, which cost $150 per month.
The mother submitted a document indicating that her monthly budget was approximately $3,600. It does not appear that she included her monthly food bill on that list, but it was undisputed that she received $600 worth of food stamps every month. The father submitted a document indicating that, during the pendency of the action, he had had monthly expenses of $2,442.27. That amount included, among other things, various expenses associated with the marital residence that the trial court ordered him to pay pending resolution of the action. The father stated that his expenses had exceeded his income by $400 to $500 each month and that he had been borrowing money from the paternal grandfather to cover the shortfall. The father testified that he could not afford to be solely responsible for the line of credit secured by the Mobile property.
The mother testified that she had two credit cards, one of which had a balance of $8,800 and the other of which had a balance of $1,100. She testified that the former credit card had a balance of $4,120.12 about the time the action was filed. The mother stated that she had borrowed $400 from a friend to support the children and her. The mother testified she had incurred $43,500 in student loans during the marriage, approximately half of which she had incurred before the action was filed. She stated that she had used a substantial amount of her student loans to support herself and the children.
The mother testified that she had begun a romantic relationship with a man whom she had met five months before the trial. The mother also admitted that, some time within the eight-month period before the trial, she had gone to New York for a few days to stay with a different male friend.
The father, when asked whether he had been faithful to the mother, responded, “Most of the time.” He then stated that he had never committed adultery. However, he acknowledged that, when he was asked during discovery whether he had had sexual relations with anyone other than the mother since the parties had married, he refused to answer, citing his constitutional right not to incriminate himself.
Kimberly Carter, a social worker with the Mobile County Department of Human Resources, handled the process by which the parties had adopted four of their children. She stated that the adoption subsidy was for the benefit and support of the adopted children. She testified that the adopted son, more so than the three adopted daughters, had special needs. Carter did state that some of the subsidy was based on the fact that the four adop-tees were siblings and would have been hard to place together.
During the trial, the parties reached an agreement that they would share joint legal custody of the children, with the mother having primary physical custody of the children and the father having visitation.
On February 22, 2010, the trial court entered a final judgment divorcing the parties. Pursuant to the parties’ agreement at trial, the trial court awarded the parties joint legal custody of the children, awarded the mother primary physical custody of the children, and awarded the father visitation rights. The trial court or *164 dered the father to pay $817 in monthly child support to the mother, an amount derived by application of the child-support guidelines contained in Rule 32, Ala. R. Jud. Admin. It awarded the mother the marital residence and the father the Mobile property, with each party to be responsible for any mortgage debt, taxes, and insurance relative to the property each was awarded. The judgment provided that each party was to be responsible for any credit-card and student-loan indebtedness in his or her name. The judgment awarded the mother the automobile she drove, it awarded the father any interest the parties had in the automotive-parts company’s truck he regularly drove, and it divided the parties’ other personal property. The trial court awarded the mother’s attorney a judgment against the father for $1,000 for attorney’s fees. The trial court reserved the issue of alimony. The father filed a timely appeal.
Our review of a divorce judgment entered after an ore tenus proceeding is well settled.
“A divorce judgment that is based on evidence presented ore tenus is afforded a presumption of correctness. Brown v. Brown, 719 So.2d 228 (Ala.Civ.App.1998). This presumption of correctness is based upon the trial court’s unique position to observe the parties and witnesses firsthand and to evaluate their demeanor and credibility. Brown, supra; Hall v. Mazzone, 486 So.2d 408 (Ala.1986). A judgment of the trial court based on its findings of facts will be reversed only where it is so unsupported by the evidence as to be plainly and palpably wrong. Brown, supra. However, there is no presumption of correctness in the trial court’s application of law to the facts. Gaston v. Ames, 514 So.2d 877 (Ala.1987).”
Robinson v. Robinson, 795 So.2d 729, 732-33 (Ala.Civ.App.2001). In addition, “[i]t is well-settled that where a trial court does not make specific factual findings, the appellate court must assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.” Baggett v. Baggett, 855 So.2d 556, 559-60 (Ala.Civ.App.2003).
The father contends the trial court erred in its division of the parties’ real property. Specifically, he argues that, in awarding the mother the marital residence on which the parties owed no debt, the trial court effectively awarded the mother $160,000 in equity. He argues that the trial court, in awarding him the Mobile property, effectively awarded him between $0 and $40,000 in equity because the Mobile property was encumbered by a $160,000 mortgage. This division of the parties’ real property, he asserts, was erroneous because a portion of the equity in the real property had come from the sale of property he had owned before the marriage; the mother’s future earning potential was greater than his; and the mother, after the parties had separated, had wrongfully denied visitation to him for a period and had caused the children to make false abuse allegations against him.
In Baggett v. Baggett, 855 So.2d at 559, this court wrote:
“On appeal the division of property and the award of alimony are interrelated, and the entire judgment must be considered in determining whether the trial court abused its discretion as to either issue. See O’Neal v. O’Neal, 678 So.2d 161 (Ala.Civ.App.1996). A property division does not have to be equal in order to be equitable based on the particular facts of each case; a determination of what is equitable rests within the sound discretion of the trial court. See Golden *165 v. Golden, 681 So.2d 605 (Ala.Civ.App.1996).
“When dividing marital property and determining a party’s need for alimony, a trial court should consider several factors, including ‘ “the length of the marriage, the age and health of the parties, the future employment prospects of the parties, the source, value, and type of property owned, and the standard of living to which the parties have become accustomed during the marriage.” ’ Ex parte Elliott, 782 So.2d 308 (Ala.2000) (quoting Nowell v. Nowell, 474 So.2d 1128, 1129 (Ala.Civ.App.1985)) (footnote omitted). In addition, the trial court may also consider the conduct of the parties with regard to the breakdown of the marriage, even where the parties are divorced on the basis of incompatibility, or where, as here, the trial court failed to specify the grounds upon which it based its divorce judgment. Ex parte Drummond, 785 So.2d 358 (Ala.2000); Myrick v. Myrick, 714 So.2d 311 (Ala.Civ.App.1998).”
Our consideration of the factors set forth in Baggett, as well as our recognition of the broad discretion a trial court possesses in dividing marital assets, leads us to conclude that the trial court’s division of the parties’ property in the present case did not constitute error.
We note that the mother opined, and the court could have concluded, that the marital residence was worth $140,000, not $160,000 as the father contends, and that the marital residence required more than $20,000 in repairs. Furthermore, the father, in arguing that the property division was inequitable, fails to consider any marital property other than the two pieces of real property the parties owned. In addition to that real property, the trial court also divided a substantial amount of personal property between the parties. For example, the trial court awarded the father, among many other things, a pop-up camper, a bass boat, a second boat, two refrigerators, and a hot tub. The father’s contention simply fails to take into consideration the entire award of marital property the trial court made to each party.
The trial court also ordered that each party be responsible for any student-loan and credit-card debt he or she had accrued. Thus, the mother is solely responsible for the repayment of more than $40,000 in student loans, half of which she had incurred before the present action was filed and much of which she stated she had used for her support and the support of the children, as well as the repayment of more than $8,000 in credit-card indebtedness, approximately half of which had accrued before the present action was filed.
As to the parties’ earning abilities, the father focuses on the fact that the mother had almost completed the requirements to obtain a master’s degree in social work, while he had not attained that level of education. He also points out that the mother earned more money than he did during the time she worked as a teacher. The trial court, in considering the parties’ earning capacities, could have concluded that the father had an ownership interest in his father’s company and, as a result, that his future earning potential was not limited to the salary he presently receives. It likewise could have concluded that he received additional income from his job in the form of weekly cash payments. Finally, the trial court could have concluded, based on the conflicting evidence presented at trial, that the father’s alleged abuse of the children and the mother was the cause of the breakdown of the marriage; fault in the breakdown of the marriage is a factor the trial court may consider in fashioning a property division. Baggett, supra.
*166 As previously stated, the division of a marital estate is not required to be equal; instead, it is required to be equitable. Baggett, supra. For the foregoing reasons, we cannot conclude, based on the arguments the father presents, that the trial court’s division of the parties’ marital estate was so inequitable as to constitute an abuse of discretion requiring reversal.
The father next contends that the trial court erred when it awarded the mother child support in an amount determined by application of the Rule 32 child-support guidelines without crediting against his child-support obligation the adoption subsidy the State provided for the parties’ adopted children. He argues that because both parties entered into the agreement by which the State pays a subsidy for the adoption of the children, the parties should split the subsidy and that his half of the subsidy should be credited against his monthly child-support obligation with regard to the four adopted children. He asserts that, to the extent his half of the adoption subsidy exceeds the amount called for in the child-support guidelines, he should not be required to pay child support for the four adopted children. He argues that adoption subsidy payments are akin to, and should be treated in the same manner as, Social Security payments received by a child because of a parent’s disability.
The purpose of the Alabama Subsidized Adoption Act, § 26-10-20 et seq., Ala.Code 1975 (“the Act”), “is to supplement the Alabama adoption statutes by making possible through public financial subsidy the most appropriate adoption of each child certified by the State Department of Human Resources as requiring a subsidy to assure adoption.” § 26-10-21, Ala.Code 1975. The Act delegates to the Department of Human Resources the task of developing regulations for the implementation of the Act. According to those regulations, to be certified for eligibility for an adoption subsidy, among other things, the “State Department of Human Resources must determine that the child is a special needs child and is in special circumstances which make it unlikely for him to be adopted” because of one or more of several reasons, including, among others, physical or mental disability, emotional disturbance, or membership in a sibling group of three or more children when the intention is to have the children adopted as a group. Ala. Admin. Code (Dep’t of Human Res.), r. 660-5-22-.06(2)(a)3. A family adopting a child who qualifies for an adoption subsidy must enter into an agreement with the Department of Human Resources setting out the terms and conditions of the subsidy prior to the issuance of the final decree of adoption. Ala. Admin. Code (Dep’t of Human Res.), r. 660-5-22-.06(3)(a).
The issue of how adoption subsidies should be treated with regard to an award of child support is one of first impression in this jurisdiction. However, our caselaw provides some guidance as to the proper resolution of the issue. In Lightel v. Myers, 791 So.2d 955 (Ala.Civ.App.2000), the trial court entered a judgment requiring the father to pay postminority support for two of his adult children who were mentally retarded. The father appealed and argued, in part, that his obligation to provide for the children’s reasonable living expenses should be offset by the children’s receipt of Supplemental Security Income benefits. This court concluded that the father was entitled to no such offset.
The court noted that prior Alabama cases had determined that, when a child receives Social Security disability benefits because of a parent’s disability, those benefits should constitute an offset to the disabled parent’s child-support obligation because the benefits were intended to re *167 place the disabled parent’s income. Lighted 791 So.2d at 958-59 (discussing Binns v. Maddox, 57 Ala.App. 230, 327 So.2d 726 (1976), and Self v. Self, 685 So.2d 732 (Ala.Civ.App.1996)). Finding that those cases were distinguishable because of the purpose of the benefits at issue in those eases, this court wrote that a child’s receipt of Supplemental Security Income benefits would not constitute an offset against the parents’ support obligations because those benefits were intended to supplement, not to replace, income:
“In Alabama, a parent’s child-support obligation may be offset by payments by a third-party source where those payments constitute a substitute income source.... However, SSI [Supplemental Security Income] benefits are a supplement to income, not a substitute for it. Therefore, we conclude that the trial court correctly refused to offset the father’s obligation to provide for the children’s reasonable living expenses by the amount of SSI benefits the children receive.”
Id. at 960.
Based on the reasoning of Lightel and the cases on which it relied, the question whether the adoption subsidy in the present case should offset the father’s child-support obligation is resolved by determining whether the subsidy constitutes a substitute for an income source or whether it is intended as a supplement to income. Although the appellate courts of this state have not addressed that issue, courts in other jurisdictions have concluded that the purpose of an adoption subsidy is to serve as a supplement to income, not as a replacement for a parent’s income, and that those payments therefore do not offset or otherwise serve as a credit against a parent’s child-support obligation.
Hamblen v. Hamblen, 203 Ariz. 342, 54 P.3d 371 (Ct.App.2002), involved a divorce action in which the father asserted, on appeal, that half of the adoption subsidy the parties received because of their adoption of five children should have been credited against his child-support obligation. Rejecting the father’s contention, the appellate court wrote:
“In A.E. v. J.I.E., 179 Misc.2d 663, 686 N.Y.S.2d 613 (1999), the Supreme Court of New York considered this issue in a context similar to the Hamblens’ case. A married couple adopted a special-needs child and received a subsidy. When they later divorced, the mother sought to have the subsidy credited against her child-support obligation. The court ruled to the contrary: The subsidy was intended for the care of the child and therefore a resource for the child, not income for the parent. Id. at 614-15. As a result, the subsidy did not reduce the mother’s financial obligation.
“Our own and the foregoing reasoning persuades us that the subsidy is intended as direct assistance to an adopted child with special needs. Despite the payment of the subsidy to the parents, it is for the benefit of the child. Indeed, it would be inappropriate to adjust a child’s entitlement to financial support because the government has elected to subsidize the increased financial commitment that a special-needs child imposes on the parents. See A.E., 686 N.Y.S.2d at 616. The subsidy is income rightly attributed to the child, not a credit against a parent’s child-support obligation.
“[The father] refers us to two cases, Pasternak v. Pasternak, 310 N.J.Super. 483, 708 A.2d 1235 (Ct.Ch.Div.1997), and Ward v. Ward, 7 Neb.App. 821, 585 N.W.2d 551 (1998), in which the courts held that a Social Security death benefit could be used to reduce the amount of child support. These cases, however, *168 are readily distinguishable. The benefits received by the children in both cases were intended to replace the wages of a deceased parent. As a substitute for parental income, those benefits reasonably would be included in the child-support calculation. The adoption subsidy, however, is for the benefit of the child and not a replacement for lost parental income. See A.E., 686 N.Y.S.2d at 615.
[[Image here]]
"... [T]he subsidy is but an addition to a parent’s obligation of financial support. If this subsidy were credited against the parent’s child-support obligation it would in effect, eliminate the supplementary effect of the subsidy. And, once the supplementary effect of the subsidy is taken, the effect of its incentive is undermined, leaving the custodial parent of the subsidized child with reduced if any support and greater difficulty in meeting the child’s particular needs. The prospect of this scenario could as well deter a prospective parent from adopting a special-needs child.
“ ‘A parent’s child support obligation is paramount to all other financial obligations, and that parent has a legal duty to support his or her biological and adopted children.’ Little v. Little, 193 Ariz. 518, 521 ¶6, 975 P.2d 108, 111 (1999). If we were to accept [the fa-therj’s position that he is entitled to a financial credit to the extent of the subsidies for his children, we would absolve him of his rightful duty to support his children and indeed place them in a worse position than children without special needs.”
Hamblen, 203 Ariz. at 345-46, 54 P.3d at 374-75 (footnote omitted; emphasis added).
In In re Marriage of Bolding-Roberts, 113 P.3d 1265 (Colo.App.2005), a noncustodial parent, on appeal from a judgment modifying his child-support obligation, argued that the obligation should have been reduced because of an adoption subsidy paid to the custodial parent. The appellate court disagreed, writing:
“A child support order is calculated to serve the best interests of children and to mitigate the potential harm to them caused by the dissolution of marriage. In re Marriage of Bohn, 8 P.3d 539 (Colo.App.2000). Had the parties not separated, the child would have enjoyed the benefit of both parents’ incomes, as well as the subsidy. Thus, the underlying intent of the child support statute is best served by declining to offset a noncustodial parent’s support obligation by the amount of an adoption subsidy or to consider the subsidy as a factor that may diminish the child’s basic needs....
[[Image here]]
“Nor are we persuaded that In re Marriage of Quintana, 30 P.3d 870 (Colo.App.2001), requires a contrary result. In Quintana, a division of this court concluded that a trial court did not abuse its discretion in adjusting [a] father’s child support obligation pursuant to [Colo.Rev.Stat.] § 14-10-115(13)(b) based upon social security disability payments received by a mother on behalf of her children.
“Unlike the social security payments at issue in Quintana, which were intended as a substitute or replacement for lost income of a disabled parent, the adoption subsidy at issue here is intended as a supplement to allow the parents to address the special needs of the adopted child. Given the different purposes underlying these two types of payments, we conclude that there is a reasonable basis for treating them differently. ...”
*169 Bolding-Roberts, 118 P.3d at 1268 (emphasis added). See also In re Marriage of Dunkle, 194 P.3d 462, 466 (Colo.App.2008) (“[S]ocial security disability benefits received on behalf of the children are designed as payments to replace the parent’s decreased earning potential, whereas- an adoption subsidy or foster care payment is paid for the benefit of the child and not as a replacement for lost parental income.”); Gambill v. Gambill, 137 P.3d 685, 690 (Okla.Civ.App.2006) (“We find persuasive the decisions finding that an adoption subsidy is income attributable to the child. The adoption subsidy is meant to supplement adoptive parents’ income for the benefit of the special needs child. The subsidy is in no sense attributable to either parent. It is paid for the benefit of the children and is not a substitute for a parent’s income.”); In re Hennessey-Martin, 151 N.H. 207, 211-12, 855 A.2d 409, 413 (2004) (“Forcing a custodial parent to accept the adoption assistance payment as a substitute for the non-custodial parent’s child support would negate the supplementary effect of the adoption subsidy because it would transform the adoption subsidy into the exclusive means of support and disregard the increased costs associated with the care of ‘special needs’ children. Similarly, allowing the petitioner to credit the adoption subsidy against her child support payment would be against the interests of the adopted children because it would diminish the resources deemed necessary for the care and incorporation of these ‘special needs’ children.”).
We agree with the reasoning contained in the foregoing cases, and we conclude that the adoption subsidy at issue in the present case does not constitute a replacement of or substitute for an income source. Instead, as the above cases hold, the adoption subsidy is supplemental to the adoptive parents’ income, and, as such, the subsidy cannot serve as a credit against the father’s child-support obligation. See Lightel, 791 So.2d at 960.[3]
The father also argues that, even if the adoption subsidy cannot be credited against his child-support obligation, the trial court should have taken the adoption subsidy into account and deviated downward from the amount of child support called for in the Rule 32 child-support guidelines. He points out that Rule 32 permits a trial court to deviate from the child-support guidelines when the child for whom support is required receives separate, unearned income. See Rule 32(A)(1)(d), Ala. R. Jud. Admin. He also asserts that the trial court should have deviated downward from the amount of child support called for by the guidelines because that amount constitutes approximately half of his net salary and paying that amount would leave him with insufficient financial resources on which to live.
“A trial court has the discretion to deviate from the child support guidelines in situations where it finds the application of the guidelines would be manifestly unjust or inequitable.” State ex rel. Golden v. Golden, 710 So.2d 924, 926 (Ala.Civ.App.1998). In the present case, we fail to find any abuse of discretion by the trial court in fixing the father’s child-support obligation at the amount called for in the child-support guidelines.
There was evidence that the cost of services for the children based on their spe- *170 dal needs, including therapy, private-school tuition, and specialized babysitting, exceeded $1,800 monthly, or approximately three quarters of the amount of the adoption subsidy. In addition to the father’s salary, we note that there was evidence from which the trial court could have concluded that the father had an ownership interest in the company for which he worked and that he received weekly cash payments from the company in addition to his reported salary. More importantly, we find that the trial court could have concluded from the evidence that the mother’s and children’s monthly expenses, coupled with those expenses related to the marital residence for which the mother would be responsible following the divorce, exceeded the sum of the mother’s income and the adoption subsidy. Thus, the trial court could have found that the mother and the father were in similar financial situations such that a deviation from the child-support obligation set forth in the Rule 32 guidelines was not warranted. Based on all of these considerations, we conclude that the father has failed to demonstrate error.
Finally, the father contends that the trial court erred when it awarded the mother’s attorney a judgment against him for $1,000 for a portion of the mother’s attorney’s fees. The determination of whether to award an attorney’s fee in a divorce action is committed to the sound discretion of the trial court. Kovakas v. Kovakas, 12 So.3d 693, 700 (Ala.Civ.App.2008). “In determining whether to award an attorney fee in a divorce action, the trial court should consider, among other things, the conduct of the parties, the financial circumstances of the parties, and the outcome of the litigation.” Id. Based on our review of the record, we conclude that the trial court did not exceed its discretion in ordering the father to pay $1,000 toward the mother’s attorney’s fee.
As to the conduct of the parties, the father correctly points out that much of the pretrial litigation between the parties revolved around the mother’s refusal to allow the father to visit the children in violation of court orders. However, offsetting the mother’s asserted misconduct is the evidence of physical abuse by the father against the mother and the children during the marriage that allegedly led to the breakdown of the marriage. We recognize that the assertions of physical abuse were disputed at trial to some extent; however, the evidence was sufficient to support a finding by the trial court that the parties’ conduct relative to the marriage warranted an award of an attorney’s fee to the mother.
The father argues that the parties’ financial circumstances did not warrant the award of an attorney’s fee given that the mother was awarded most of the equity in the parties’ real property and that the mother’s earning capacity exceeded his. Our review of the record indicates that there was evidence indicating that the financial circumstances of the parties were similar with regard to their ability to pay their monthly expenses, however, and, as previously discussed, we do not believe that the trial court was required to weigh heavily the mother’s assertedly greater earning capacity than the father’s given the evidence indicating that the father was a part owner in the company for which he worked and the fact that the mother, in pursuing a career in social work, would be the sole custodial parent of five children. We also note that the amount of the attorney-fee award, $1,000, is not exorbitant.
Considering the record as a whole and the level of discretion afforded the trial court with regard to the award of an attorney’s fee in this case, we conclude that the *171 trial court did not exceed its discretion when it ordered the father to pay $1,000 of the mother’s attorney’s fees. The father’s contrary assertion is without merit.
Based on the foregoing, we conclude that the father has failed to demonstrate a basis on which to hold the trial court in error. As a result, we affirm the trial court’s judgment.
AFFIRMED.
PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.

. As explained in more detail later in this opinion, the Alabama Subsidized Adoption Act provides for the payment of a subsidy to make possible the adoption of children who would otherwise not be likely to be adopted. §§ 26-10-22 and 26-10-25, Ala.Code 1975.

. The therapist’s report resulted in an investigation by the Department of Human Resources of whether the father had sexually abused two of the children and had physically abused one of the children. After multiple interviews with the children and others, the protective-services worker who had conducted the investigation concluded that there was insufficient evidence to support the allegations of abuse. The worker opined that the children had been influenced by the therapist or the mother to say that they had been abused. The worker also believed that the timing of the allegations, occurring during the pendency of the divorce action, was suspicious.

. The father does not argue on appeal that, and we do not address the question whether, the adoption subsidy should be counted as income to the mother in calculating the parties’ child-support obligations. Except as stated below, the father's argument with regard to the adoption subsidy is limited to his contention that half of the adoption subsidy should be credited against his child-support obligation relative to the adopted children.