# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00822-COA

**MICHELLE BEGNAUD**                                                    **APPELLANT**

**v.**

**JAMIE A. BEGNAUD**                                                     **APPELLEE**

DATE OF JUDGMENT:           03/20/2023
TRIAL JUDGE:                HON. LAWRENCE PRIMEAUX
COURT FROM WHICH APPEALED:  CLARKE COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:    JEFFREY BIRL RIMES
                            SARAH-LINDSEY HAMMONS
ATTORNEYS FOR APPELLEE:     THEODORE MARK COOPERSTEIN
                            SUSAN JEANNE CLOUTHIER
NATURE OF THE CASE:         CIVIL - DOMESTIC RELATIONS
DISPOSITION:                REVERSED AND REMANDED - 01/07/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT**:

¶1. Jamie and Michelle Begnaud were married and had one biological child and one adopted child. On February 12, 2021, after fourteen years of marriage, Michelle filed a complaint for divorce on fault-based grounds against her husband, Jamie, who counterclaimed for a divorce. The parties ultimately consented to an irreconcilable differences divorce and agreed to allow the chancellor to decide the distribution of the unresolved marital property and child support, among other disputes submitted to the chancellor for resolution.

¶2. As a part of the parties' divorce decree, the chancellor made an equitable distribution of the marital assets. The chancellor ordered Jamie to pay child support payments but allowed

the payments to be reduced to one-half of the adoption assistance Michelle was being paid by the State. As a result, the chancellor awarded Michelle child support in the sum of $581 per month, which was $350 less than the statutory guideline. The chancellor further ordered that Michelle shall claim the minor child as a dependent for federal and state income tax purposes in even years, and Jamie shall claim the minor child in odd years. The chancellor also ordered Michelle to receive $271,197, all of which was from Jamie's Vanguard retirement account.[1] The distribution resulted in Jamie receiving 53% of the marital estate and Michelle receiving 47% of the marital estate. Michelle now appeals on five issues: (1) whether the chancellor erred by failing to assign a value to all the marital property before ordering its distribution; (2) whether the chancellor erred when he awarded Jamie a greater share of the marital estate despite Michelle's financial need and Jamie's culpability for the breakdown of the marriage; (3) whether the chancellor abused his discretion when he ignored the costs Michelle would incur to access the retirement funds the chancellor awarded her in order to meet her immediate needs; (4) whether the chancellor erred by awarding Jamie a credit against his child support obligation for supplemental government assistance benefits received by the minor child through the adoption assistance program; and (5) whether the chancellor erred when he found there was no evidence of benefit or detriment to either party

---

[1] In the "Amended Final Judgment of Divorce," the chancellor stated that if the Vanguard retirement account is insufficient to meet the amount of $271,197, Jamie "shall pay unto [Michelle] an equalizing payment in cash equal to the difference within thirty days of her receipt of the Vanguard payment."

to share equally in claiming the minor child as a dependent for tax purposes. After review, we reverse and remand.

## FACTS AND PROCEDURAL BACKGROUND

¶3.     Jamie and Michelle Begnaud were married on May 26, 2017. Jamie worked at Norfolk Southern Railway Company as a signal technician for the entirety of the marriage. His monthly income, as stated on his Rule 8.05 financial statement, was $7,471.80. *See* UCCR 8.05. Michelle worked at Southern Craftsman/Woodstock Furniture with a monthly income of $2,689.20. The couple had two children together. At the time of the divorce, one child was deceased, and their other child was their adopted fourteen-year-old son, K.B.[2]

¶4.     The couple separated in January 2021, and Jamie moved into the "apartment/shop" on the Begnauds' property. Michelle filed a complaint for divorce in 2021. Jamie counterclaimed for a divorce, but the parties ultimately consented to an irreconcilable differences divorce. The parties agreed to allow the chancellor to determine certain issues. The issues relevant to this appeal are equitable distribution and child support. On November 2, 2022, a trial occurred in the Chancery Court of Clarke County, Mississippi.

¶5.     Michelle Begnaud was the first witness called to testify. In her testimony, Michelle described the relationship between K.B. and Jamie before the separation as "[v]ery tumultuous [and] rocky." She described their relationship after Michelle and Jamie separated as "fair." Michelle testified that she believed Jamie was at fault for the demise of their

---

[2] Initials have been used for K.B., the minor child, to protect his identity.

3

marriage because he consumed "a lot" of alcohol, and "[h]e berate[d] and [was] emotionally and just verbally abusive to both [K.B.] and [Michelle]." She testified that law officers were called on Jamie "around three or four times" because of his actions.

¶6.    To determine equitable distribution during trial, the parties created a color-coded chart of their assets. The parties stipulated, and the court accepted, that the pink items would be awarded to Michelle, the blue items would be awarded to Jamie, the red items were to be divided equally, and the black items were contested and to be adjudicated by the chancellor. Michelle stated that the total value of the estate was worth $694,648.95. Jamie stated that the total value of the estate was worth $560,930.95.

¶7.    One group of the contested items was the guns and the items in the gun safe located in the couple's bedroom in the marital home. Michelle testified that the safe contained a "mixture of pistols, hunting rifles, assault files, [and] some ammo." At trial, she was given an itemized list of the guns that were in the gun safe and was asked to asterisk each item on the list that she would like to receive. She marked the ones that she believed to be K.B.'s because she wanted "all the [guns] that belong[ed] to [K.B.]."

¶8.    Michelle also testified that Jamie had a Vanguard fund that contained $255,377.49.[3] Jamie contributed $18,000 to that account before their marriage. She testified that she should receive "half" of the amount in the Vanguard account.

---

[3] The Vanguard Retirement Account Summary Statement shows that the account contained an amount of $271,197 as of September 30, 2022. In contrast, the parties' color-coded chart showed that an agreed value for the account was $255,377.49.

¶9.    During Michelle's testimony, she stated that she received $700 a month from the State under the State's adoption assistance program. She testified that she should receive the full amount of the assistance after the divorce and also believed Jamie should have to pay her child support because she spent "about a thousand a month" on K.B. She also testified that she thought she should have the final decision-making rights because she was "the one that provide[d] for [K.B.]," took him to "doctor's appointments," and went to K.B.'s "school and [spoke] to the teachers and secretary." She also explained that she should be the one to claim K.B. as a dependent on her tax return because "K.B. reside[d] with [her,]" and Michelle has "provided everything for [K.B.]."

¶10.    Since Michelle had "provided everything for [K.B.]," including "school supplies, school clothes, shoes . . . fees at school," she testified that she needed $1,200 a month in alimony in addition to child support. At the time of trial, she was receiving $390 per month in child support from Jamie.

¶11.    Jamie Begnaud was also called to testify. On direct examination, he testified that it was Michelle's "idea" to separate and get a divorce. He testified that Michelle was at fault for the marriage ending because "she left the marital bedroom" and "purchased a bunch of things and ran up a bunch of bills that [Jamie] had no knowledge of," and there was "no communication in the marriage." Jamie testified that law enforcement was called on him on three separate occasions. One occasion was because K.B. "made an accusation that [he] abused him" but the officers "notice no marks" on K.B., so "nothing was said." On another

occasion, law enforcement was called on Jamie at a family gathering while he was consuming alcohol. Jamie denied being "drunk," having a drinking problem, or being emotionally and verbally abusive. He testified that he was investigated by Child Protective Services because he "has punished [K.B.]" and K.B. "went to school and informed the counselor and told that counselor [Jamie] was abusing him[.]"

¶12. During Jamie's testimony, he was given the itemized list of guns from the gun safe that Michelle had asterisked. He testified that some of the guns marked by Michelle were not K.B.'s guns. Jamie was then instructed to initial next to each gun he believed to be K.B.'s. He testified that he purchased all of the guns except for a "30-06 that Michelle bought as a birthday gift." He testified that the guns that belonged to him were worth between $1,500 and $2,500. The court stated that an expert witness needed to be called to determine an accurate estimate of the guns because the chancellor "found it hard to believe that you could purchase that many guns for one to two thousand dollars." Jamie testified that the scopes were worth $1,000 in total and that the ammunition was worth $200.

¶13. Jamie testified that he believed Michelle should have had to pay him alimony because he was "use to somebody helping with the bills" and he had to refinance the marital home in order to pay her equitable division. Jamie also testified that he was "willing to" continue to pay the $390 a month he was paying for temporary child support, but he was against paying that amount if Michelle received the adoption assistance.

¶14. When asked, "[W]ho do you believe should have financial decision-making rights

6

regarding K.B.'s health, education, and wellness?" Jamie responded that he should be the one to make the decisions because he was "the more responsible adult." He also testified that he should be able to claim K.B. as an exemption or deduction for tax purposes because he "carried the marriage the whole time, the mortgage, [and] [K.B.'s] health care."

¶15. Jamie was then questioned about his Rule 8.05 financial statement. The financial statement and the color-coded chart had a $20,000 discrepancy regarding Jamie's Vanguard retirement account. He testified that the discrepancy was due to the fact that "Vanguard fluctuates from time to time."

¶16. On November 16, 2022, the chancellor rendered an opinion. In his opinion, he explained that since the parties disagreed on many of the values on the color-coded chart, he would calculate the value of their assets by averaging the parties' conflicting values, which equaled $627,789.95 in total.[4] On November 28, 2022, the chancellor entered a final judgment of divorce. The chancellor distributed the property "in a nearly equal split," with Michelle receiving $222,240 and Jamie receiving $222,506 of the property value. However, it should be noted that combining $222,240 and $222,506 does not equal $627,789.95. Therefore, there was roughly $200,000 not accounted for in the chancellor's original final judgment.

---

[4] The judge stated in his opinion on November 16, 2022, that he used the parties' post-trial stipulation to determine the value of the estate. Jamie stipulated that the total value of the estate was $560,930.95. Michelle stipulated that the total value of the estate was $694,648.95. The average of these two numbers is $627,789.95.

¶17. The original final judgment ordered Jamie to pay $500 for 24 consecutive months in rehabilitative alimony to Michelle. Jamie was also ordered to pay $581 per month in child support to Michelle. The chancellor calculated the amount of child support by taking the amount suggested by the statutory guideline, which was $931, and deducting $350 (one-half of the $700 adoption assistance payment that Michelle received every month). The final judgment also stated that Michelle was awarded all items in pink and some of the items in black from the color-coded chart, $204,523 from the Vanguard account, and 46%[5] of a Railroad Retirement Fund. Jamie was awarded all items in blue, including the marital home which had $228,184 in equity. He was also awarded some of the items in black, including the unvalued guns, ammunition, and scopes, $81,382 of the Vanguard account, and 54% of the Railroad Retirement Fund.

¶18. Michelle filed a motion to amend the final judgment. On March 20, 2023, the chancellor entered his amended final judgment. The amended final judgment simply awarded Michelle all the funds in the Vanguard account and kept the rest of the distribution the same. The chancellor found that the total value of the marital estate was $627,884.95. Michelle was awarded a total of $291,746.50, and Jamie was awarded a total of $329,811.96.[6] On March

---

[5] The chancellor found that Michelle was entitled to 46% of the Railroad Retirement Fund because 46% of the Tier 2 benefits were earned during the marriage.

[6] There still seems to be a discrepancy in the chancellor's equitable distribution. $291,746.50 plus $329,811.96 equals $621,558.46, not $627,884.95. Thus, there is a $6,326.49 discrepancy.

24, 2023, Michelle filed a Motion for Reconsideration or, in the alternative, New Trial. The chancellor denied Michelle's motion. On July 20, 2023, Michelle appealed the chancellor's finding and raised five issues: (1) whether the chancellor erred by failing to assign a value to all of the marital property before ordering its distribution; (2) whether the chancellor erred when he awarded Jamie a greater share of the marital estate; (3) whether the chancellor abused his discretion when he ignored the costs Michelle would incur to access the retirement funds the chancellor awarded her to meet her immediate needs; (4) whether the chancellor erred by awarding Jamie a credit against his child support obligation for benefits received through the State's adoption assistance program; (5) whether the chancellor erred when he found there was no evidence of benefit or detriment to either party to share equally in claiming the minor child as a dependent for tax purposes.

**STANDARD OF REVIEW**

¶19.    "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Rhodes v. Rhodes*, 52 So. 3d 430, 435 (¶15) (Miss. Ct. App. 2011) (citations and internal quotation marks omitted). This Court "will not disturb a chancellor's factual findings unless the chancellor's decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard." *Id.* Even if we disagree with the findings of fact and would arrive at a different outcome, "[w]e do not substitute our judgment for that of the chancellor." *Id.*   When reviewing a chancellor's

9

interpretation and application of the law, our standard of review is de novo. *Id.*

## ANALYSIS

¶20.    Michelle argues the chancellor erred in its marital-property evaluation and equitable-distribution analysis on several grounds. More specifically, Michelle argues that the chancellor erred because he did not determine the value of the guns, ammunition, and scopes located in the gun safe in the couple's bedroom or properly consider the "tax consequences" when analyzing the *Ferguson*[7] factors.

¶21.    The Mississippi Supreme Court has stated in *Chamblee v. Chamblee*, 637 So. 2d 850, 864 (Miss. 1994), that all equitable division of property does not necessarily mean an equal division of property, and "fairness is the prevailing guideline in marital division." *Ferguson*, 639 So. 2d at 929.

¶22.    When determining property division in a divorce action, a chancellor must "(1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the marital assets equitably." *Wheat v. Wheat*, 37 So. 3d 632, 637 (¶14) (Miss. 2010) (citing *Ferguson*, 639 So. 2d at 928). "[T]he foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof." *Dunaway v. Dunaway*, 749 So. 2d 1112, 1118 (¶14) (Miss. Ct. App. 1999) (citing *Ferguson*, 639 So. 2d at 929). "The valuation of the property is a question of fact." *Messer v. Messer*, 850 So. 2d 161, 170 (¶42) (Miss. Ct. App. 2003) (citing *Ward v. Ward*, 825 So. 2d 713, 719 (¶21)

---

[7]  *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994)).

(Miss. Ct. App. 2002)). Since it is a question of fact, the chancellor has the "sole authority and responsibility to assess witness credibility." *Culumber v. Culumber*, 261 So. 3d 1142, 1150 (¶24) (Miss. Ct. App. 2018).

¶23. In *Williams v. Williams*, 303 So. 3d 824, 833 (¶36) (Miss. Ct. App. 2020), the chancellor failed to give the marital assets value before dividing the assets between the husband and wife. Like here, the couple in *Williams* had differing property values listed on their Rule 8.05 financial statements and the chancellor failed to make findings of fact to determine the values of those assets. *Id.* For example, the husband "listed the value of the marital home at $34,193, and [the wife] listed the value at $64,000." *Id.* The chancellor failed to make a factual determination for the value of the marital home in his equitable-distribution determination. *Id.* This Court held that it was "impossible to know from the chancellor's order what values were assigned" to the differing property values. *Id.* at (¶37). The Court reversed and remanded for a factual determination because we were "unable to conduct an appropriate appellate review to determine whether the chancellor abused her discretion" due to "the lack of findings of fact." *Id.*

¶24. Here, the chancellor classified all the property as marital and valued the items by averaging the value each party placed on the items. However, the chancellor failed to value items 7 and 8 on the color-coded chart, which included guns, ammunition, and scopes. Michelle and Jamie stipulated to those assets' different values. Michelle stated on the color-coded chart that the value of the guns, ammunition, and scopes was $31,000. Jamie stated

11

on the color-coded chart that the value of the guns, ammunition, and scopes was $2,400. Jamie testified that the guns that belonged to him were worth between $1,500 to $2,500. At trial, the chancellor stated that he "[found] it hard to believe that you could purchase that many guns for one to two thousand dollars." At the end of trial, the chancellor stated that "[he was] going to identify an expert to value the guns and ammunition . . . as soon as [he could] get [an expert] appointed." However, the chancellor's opinion stated that the "court did consider having the firearms appraised, but was unsuccessful in identifying anyone willing to accept an appointment as an expert, and so averaged the values given." However, the court never stated the average value of the firearms or included that value in the equitable distribution.

¶25. This Court is unable to conduct an "appropriate appellate review to determine whether the chancellor abused his discretion" because it is "impossible to know from the chancellor's order what values were assigned" to the items. *Id.* Accordingly, we remand this case for a determination of the value of items 7 and 8 on the parties' color-coded chart and for reconsideration of equitable distribution.

¶26. Michelle also argues that the chancellor erred when he failed to consider the tax and economic consequences associated with the Vanguard retirement account, which is a required consideration under the *Ferguson* factors. *Ferguson*, 639 So. 2d at 928.

¶27. In *Ferguson*, the Mississippi Supreme Court stated:

> Given the development of domestic relations law, this Court recognizes the
> need for guidelines to aid chancellors in their adjudication of marital property

division. Therefore, this Court directs the chancery courts to evaluate the division of marital assets by the following guidelines and to support their decisions with  findings of fact and conclusions of law for purposes of appellate review.

*Id*. The *Ferguson* factors include, but are not limited to:

(1) substantial contribution to the accumulation of property;
(2) degree to which each spouse has expended, withdrawn, or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree, or otherwise;
(3) the market value and emotional value of assets subject to distribution;
(4) value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
**(5) tax or other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution**;
(6) extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
(7) needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity; and
(8) any other factor which in equity should be considered.

*Id.* (Emphasis added). The Mississippi Supreme Court held that applicable *Ferguson* factors

"must be considered on the record in every case." *Lowrey v. Lowrey*, 25 So. 3d 274, 286 (¶7)

(Miss. 2009). However, only the factors that are "applicable" to the property in question must

be considered. *Sproles v. Sproles*, 782 So. 2d 742, 748 (¶25) (Miss. 2001) (citing *Weathersby*

*v. Weathersby*, 693 So. 2d 1348, 1354 (Miss. 1997)). Stated more simply, the "failure to

consider all applicable *Ferguson* factors is error and mandates reversal." *Lowrey*, 25 So. 3d

at 286 (¶29) (citing *Ferguson*, 639 So. 2d at 928).

¶28.    In *Louk v. Louk*, 761 So. 2d 878, 881 (¶13) (Miss. 2000), the Mississippi Supreme

13

Court reversed in part for the chancery court's failure to consider tax consequences. In *Louk*, Patty and John consented to a divorce on the ground of irreconcilable differences. *Id.* at 880 (¶4). Patty was dissatisfied with the judgment and argued, among other issues, that the court erred by failing to consider and making a finding on "the tax consequences of the equitable distribution and the needs of the parties for financial security." *Id.* at 883 (¶7). The Mississippi Supreme Court found that the chancellor did "not specifically cite or refer to the *Ferguson* factors in any meaningful analysis." *Id.* at (¶12). The case was remanded in order for the chancellor "to make specific findings of fact regarding the factor set forth . . . in *Ferguson*, including the tax consequences of each party, and to allow for an equitable division of the parties' interests." *Id*. at (¶13).

¶29.    In *Davis v. Davis*, 832 So. 2d 492, 502 (¶¶37-38) (Miss. 2002), the Mississippi Supreme Court upheld the chancellor's equitable distribution determination even though the husband suffered "harsh" tax consequences. When determining the equitable distribution, the chancellor made factual determinations on each of the *Ferguson* factors. *Id.* at 501 (¶34). Regarding the tax-consequences factor, the chancellor stated that the husband "was granted the right to claim the children as dependents on his tax returns. Some of the unliquidated assets that subject [the husband] to taxes if liquidated were assets to which he testified that he is unwilling to share or split." *Id.* at 502 (¶34). The husband appealed to the Supreme Court of Mississippi. *Id.* at 495 (¶9). One issue the husband argued was that the chancellor erred in his division of assets because of the "harsh tax consequences placed on him by the

14

division." *Id.* at 502 (¶37). The Mississippi Supreme Court stated that there was "sufficient evidence in the record to explain the unequal tax consequences of the property division" because the husband was awarded the right to claim his children as dependents on his tax return, and the husband requested many of the non-liquid assets. *Id.* He also had a steady stream of income, which likely decreased his need to liquidate his assets. *Id.* The Court pointed out that the wife had no income and was likely going to need to liquidate assets so she could obtain a new residence and other necessities. *Id.* She also needed "extensive re-certification of 1,000 hours or more" to gain employment in her chosen field. Therefore, the Court held that "[t]here is no evidence that the chancellor abused his discretion in his 50/50 division of the marital assets." *Id.* at 502 (¶38).

¶30. Here, the chancellor did not refer to the "tax or other economic consequences" factor in "any meaningful analysis." *Louk*, 761 So. 2d at 881 (¶12). He simply stated in the amended Opinion that "there is no evidence regarding this factor." However, there was evidence that Michelle would suffer from tax consequences in order to obtain cash to live her new life without Jamie.

¶31. The husband in *Davis* and Michelle in this case both received harsh tax consequences. Most of Michelle's equitable distribution awards were derived from Jamie's retirement accounts. She received no other cash distributions. According to Michelle, she would have to pay a 10% penalty and 30% in taxes if she liquidated the funds in the Vanguard retirement

15

account.[8] If this is true, she would receive $182,787.70, not the $279,197 the chancellor awarded. Thus, her share would be less than what the chancellor ordered. It is obvious to this Court that for Michelle to obtain cash to obtain a home and other essentials, she would have to take out cash from the retirement account. Because the chancellor failed to consider those tax considerations without awarding her any other cash distributions, we remand this case for further consideration and a new equitable distribution if warranted.[9]

¶32.    Lastly, Michelle argued that the chancellor erred by awarding Jamie a credit against his child support obligation for benefits received through the State's adoption assistance program.[10]

¶33.    Mississippi Code Annotated section 43-19-101 provides the guidelines for calculating child-support awards. Miss. Code Ann. § 43-19-101 (Rev. 2015). The guideline uses the "number of children" and the percentage of "adjusted gross income that should be awarded for support." *Id.* According to the statutory recommendations, a noncustodial parent of one

---

[8]  This information was obtained from Michelle's "Motion for Reconsideration Or, In The Alternative, New Trial."

[9]  It is important to note that Jamie was awarded the marital home, which has $228,184.00 in equity, that he could retain without tax consequences, unlike Michelle.

[10]  Michelle argued two other issues in this appeal. First, whether the chancellor erred when he found there was no evidence of benefit or detriment to either party to share equally in claiming the minor child as a dependent for tax purposes. Second, whether the chancellor erred when he awarded Jamie a greater share of the marital estate. We will not discuss these two issues since we are remanding for the chancellor to revisit his equitable distribution determination.

child should pay 14% of their adjusted gross income to the custodial parent in child support. *Id.* The statutory guidelines are "[a] rebuttable presumption of justness or appropriateness" for an award based upon these guidelines, but it "may be overcome by a judicial or administrative body . . . making a written finding or specific finding on the record that the guidelines are inappropriate in a particular case." *Bell v. Bell*, 206 So. 3d 1254, 1258-59 (¶8) (Miss. Ct. App. 2016) (citing Miss. Code Ann. § 43-19-103 (Rev. 2015)). However, these guidelines "do not control per se the amount of an award of child support," *Clausel v. Clausel*, 714 So. 2d 265, 267 (¶8) (Miss. 1998)), because the chancellor "has special knowledge of the actual circumstances." *Gunter v. Gunter*, 281 So. 3d 283, 286 (¶10) (Miss. Ct. App. 2019) (quoting *McEachern v. McEachern*, 605 So. 2d 809, 814 (Miss. 1992)). Therefore, the chancellor can depart from the guidelines if he makes "a written finding on the record that the application of the guidelines would be unjust or inappropriate." *Dunn v. Dunn*, 695 So. 2d 1152, 1155 (Miss. 1997).

¶34.     The Mississippi Supreme Court held in *Mooneyham v. Mooneyham*, 420 So. 2d 1072, 1074 (Miss. 1982), that a payor is entitled to use his or her social security disability benefits as a credit toward child support obligations. Similarly, in *Bradley v. Holmes*, 561 So. 2d 1034 (Miss. 1990), the Court held that a child support payor is entitled to a credit for Social Security retirement benefits paid to the child support payee for the benefit of the child on account of the payor's earnings and retirement. *Id.* at 1035-36. In *Hammett v. Woods*, 602 So. 2d 825 (Miss. 1992), the Court reaffirmed "that [Social Security] benefits received by a

17

minor child based on his parent's disability or retirement are considered an alternative source of payment which should be credited toward satisfaction of child support obligations." *Id*. at 828. However, the Court also held that a child support payor is not entitled to a credit for Social Security benefits received by the child on account of the child's own disability. *Id*. at 828-29; *see also* Deborah H. Bell, Bell on Mississippi Family Law § 13.04[2][d], at 495-96 (3d ed. 2020) (explaining that a payor is entitled to a credit for benefits "a child receives . . . based on [the] payor's retirement or disability" but not for benefits "received by a disabled child on their own account").

¶35. Michelle currently receives an adoption assistance payment for the benefit of K.B. from the Mississippi Department of Child Protection Services (MDCPS). According to state law, "[a]uthorization of Adoption Assistance is based upon the needs of the child." 18 Miss. Admin. Code Pt. 6, § G I-2;[11] *see also* Miss. Code Ann. § 93-17-61(2) (Rev. 2021) ("When supplemental benefits last for more than one (1) year, the adoptive parents shall present an annual written certification that the child remains under the parents' care and that the child's need for supplemental benefits continues.").[12] The State makes these payments to Michelle,

---

[11] Mississippi's adoption assistance program is part of a joint federal-state program funded in part by federal funds. *See* 18 Miss. Admin. Code Pt. 6, § G II-2; *Hamblen v. Hamblen*, 54 P.3d 371, 373 (Ariz. Ct. App. 2002) ("Every state now has an adoption assistance program" "as part of a joint federal and state plan to promote and subsidize the adoption of children with special needs.").

[12] Mississippi Departments of Child Protection Services, Adoptive Parent Resources. https://www.mdcps.ms.gov/foster-and-adoptive-parents/adoptive-parent-resources (last

as the custodial parent, for the benefit of K.B. *to meet K.B.'s needs*. These payments are based on K.B.'s needs, not Jamie's own earnings, retirement, or disability. Under *Hammett*, Jamie is not entitled to a "credit" against his child support obligation for these payments made by the State of Mississippi for the benefit of K.B.

¶36.    Here, in the chancellor's amended opinion, he awarded Jamie a "credit" for the adoption assistance payment that the State pays for the benefit of K.B. Specifically, the chancery court stated, "The Court finds that one-half of the $700.00 monthly adoption supplement received by [Michelle] *is attributable to* [*Jamie*] *and he should receive credit for it.*" (Emphasis added). The chancellor ordered Jamie to pay Michelle child support in the amount of $581 per month rather than the statutorily recommended $931 per month because of the "credit." The adoption assistance payment from the State is for the benefit of K.B. and is based on K.B.'s needs. Under our Supreme Court's decision in *Hammett*, the payment is not "attributable to" Jamie and he is not entitled to "credit for it."[13] Accordingly, we reverse

visited Jan 6, 2025).

[13]   Courts in other states have reached similar conclusions regarding adoption assistance payments and have held that such payments should not be credited against an obligation to pay child support. *See Tluzek v. Tluzek*, 179 So. 3d 455, 456 (Fla. 5th Dist. Ct. App. 2015) (a child support payor is not entitled to a credit against his child support obligation based on adoption assistance payments paid by the state); *Hamblen*, 54 P.3d at 374 (¶13) (adoption assistance payments are not "the parents' property" but rather are paid for the benefit of "the children to address their special needs"); *Million v. Million*, No. 28651, 2020 WL 5989214 4 (¶13) (Ohio Ct. App. 2020) ("Adoption Assistance stipends should be treated as analogous to [Social Security] benefits received by a disabled child because the adoption stipends are for the benefit of the child, and not the parent, as the subsidy is based upon the child's special needs."); *see also, e.g.*, *In re Hennessey-Martin*, 855 A.2d 409, 411-13 (2004)

19

and remand on the issue of child support.

## CONCLUSION

¶37.    The chancellor erred on three issues. First, the chancellor did not value the guns, ammunition, and scopes before awarding them to Jamie. This matter must be remanded because, as discussed above, "the foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof." *Dunaway*, 749 So. 2d at 1118 (¶14) (citing *Ferguson*, 639 So. 2d at 929). Second, the chancellor did not consider the tax consequence Michelle would suffer when she receives the funds from the Vanguard retirement account. We must remand on this issue for the chancellor "to make specific findings of fact regarding the factors set forth by this Court in *Ferguson*, including the tax consequences to each party, and to allow for an equitable division of the parties interests." *Louk*, 761 So. 2d at 883 (¶13). Third, the chancellor erred when awarding Jamie a credit for his child support payments. We  reverse and remand this issue to the chancery court pursuant to *Hammett* in that the adoption assistance payments are not attributable to Jamie since they are awarded to meet K.B.'s needs.

¶38.    **REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. ST. PÉ, J., NOT PARTICIPATING.**

---

(holding that a child support payor was not entitled to a credit against his child support obligation for adoption assistance payments); *Gambill v. Gambill*, 137 P.3d 685, 689-90 (Okla. Civ. App. 2006) (same); *W.R. v. C.R.*, 75 So. 3d 159, 169 (Ala. Civ. App. 2011) (same); *Burcham v. Burcham*, 886 N.W.2d 536, 551 (Neb. Ct. App. 2016) (same).